## COMMONWEALTH vs. RODOLFO CARR.

Suffolk. December 7, 2012. - April 16, 2013.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & LENK, JJ.

*Homicide. Constitutional Law,* Speedy trial, Grand jury, Admissions and confessions, Waiver of constitutional rights, Confrontation of witnesses, Identification, Assistance of counsel. *Due Process of Law,* Grand jury proceedings, Loss of evidence by prosecution, Identification, Assistance of counsel. *Practice, Criminal,* Speedy trial, Grand jury proceedings, Loss of evidence by prosecution, Motion to suppress, Admissions and confessions, Waiver, Confrontation of witnesses, Identification of defendant in courtroom, Assistance of counsel, Capital case. *Evidence,* Grand jury proceedings, Identification, Photograph, Consciousness of guilt, Exculpatory, Admissions and confessions, Death certificate. *Witness,* Expert, Impeachment. *Grand Jury. Identification.*

Discussion of the standard of review of a claim of a violation of a criminal defendant's constitutional right to a speedy trial. [859-861]

A Superior Court judge properly denied a criminal defendant's motion to dismiss the indictment premised on his claim of violation of his constitutional right to a speedy trial, where, although the thirty-year length of the delay was extraordinary [861], none of the periods comprising the delay was attributable to the Commonwealth [861-864], the defendant's belated first assertion of his speedy trial right weighed heavily against him [864-865], and the prejudice that could be presumed from the extraordinary delay was not in and of itself sufficient to carry his claim and was only part of the mix of relevant facts [865-866].

There was no error in the denial of a criminal defendant's motions to dismiss the indictment predicated on impairment of the grand jury, where certain testimony of a police officer and a witness, although contradicted by police reports and other police documents, was neither without basis nor misleading in the manner the defendant suggested and in any event was unlikely to have influenced the decision to indict. [866-869]

There was no error or other abuse of discretion in the denial of a criminal defendant's motion to dismiss the indictment premised on his claim that the loss of significant evidence violated his right to a fair trial, where the missing evidence was neither clearly exculpatory nor of any demonstrable benefit to the defendant, the defendant offered little more than speculation to support his claims, and the risk of prejudice was minimal where the defendant was able during cross-examination of the testifying police officers to exploit the lost evidence by casting doubt on the thoroughness and accuracy of the police investigation. [869-872]

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress statements he made during an interview with police while he was incarcerated in another jurisdiction, given that there was no error in the judge's determination that the defendant was not in custody for purposes of his Miranda rights and that, in any event, adequate Miranda warnings were given and the defendant voluntarily, intelligently, and knowingly waived his rights. [872-874]

There was no abuse of discretion in the denial of a criminal defendant's motion for funds for an expert witness on identification pursuant to G. L. c. 261, § 27C, where, given that the witnesses were familiar with the defendant prior to the shooting, there was less reason for concern about the effect of the passage of time on their identifications. [874]

At a murder trial, the admission of a death certificate containing a testimonial in fact statement of the medical examiner who prepared and signed it, absent the medical examiner's testimony, violated the defendant's right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights; nonetheless the admission of the certificate was harmless beyond a reasonable doubt, where the cause of death was not a disputed issue at trial. [875-877]

At a murder trial, there was no error in the judge's decision to allow two witnesses to make in-court identifications of the defendant. [877]

At a murder trial, the erroneous admission of detailed employment testimony of a police officer that was unrelated to the basis of his identification of the defendant had but very slight effect on the jury and, even assuming the error had been preserved, was not prejudicial. [878-879]

At a murder trial, counsel's failure to impeach a witness [879-880]; failure to sanitize or challenge the authenticity of a police photograph of the defendant [880-881]; failure to call additional witnesses [881-882]; and failure to request a consciousness of guilt instruction did not constitute ineffective assistance [882-883].

There was no merit to a criminal defendant's claims of numerous trial errors and claims of ineffective assistance of counsel. [883]

INDICTMENT found and returned in the Superior Court Department on May 23, 1997.

Motions to dismiss the indictment, filed on November 25, 2002, January 7, 2003, and May 2, 2003, were heard by *Patrick F. Brady*, J.; motions to dismiss the indictment and a motion for funds for an expert witness, filed on April 15, and June 14, 2004, respectively, were heard by *Barbara J. Rouse*, J.; a motion to dismiss the indictment and a pretrial motion to suppress evidence, filed on November 29, 2004, were heard by *Christine M. McEvoy*, J.; and the case was tried before her.

*Russell C. Sobelman* for the defendant.

*Amanda Teo*, Assistant District Attorney (*Edmond J. Zabin*, Assistant District Attorney, with her) for the Commonwealth.

LENK, J. On December 15, 2004, a Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation for the fatal shooting of Carlos Matos on August 5, 1974. Although a murder complaint issued against the defendant shortly after the victim's death, the defendant fled the Commonwealth and was not indicted until 1997. In the interim, he was charged, inter alia, with numerous drug crimes in Indiana and Illinois under various aliases. The Commonwealth again learned of the defendant's whereabouts in 1994, while he was incarcerated in an Indiana state prison. In 1997, the defendant waived extradition and was returned to Massachusetts.

On appeal, the defendant claims error in a number of respects. He asserts that his motions to dismiss for violations of his constitutional right to a speedy trial, impairment of the integrity of the grand jury, and loss of evidence, as well as his motion for funds to retain an identification expert, should not have been denied. He maintains that the trial judge erred in denying his motion to suppress statements he made to Boston police officers while incarcerated in Indiana, and also that there were multiple errors in the judge's evidentiary rulings. Additionally, the defendant claims that his trial counsel was ineffective. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E, to reduce the degree of guilt or to order a new trial.

*Background.* Based on the evidence admitted at trial, the jury could have found the following. On August 5, 1974, the defendant, then twenty years old, and the victim, who was fourteen years old, were involved in a physical altercation near a park on Dudley Street in the Roxbury section of Boston. The defendant, who lived across the street from the park, waited near a light pole along the third base line of the park's baseball field until the victim returned to the park. The defendant then retrieved a long rifle with a scope that he had hidden in some nearby bushes. Carlos Carrasquillo, the victim's cousin, was playing baseball when he saw the defendant aim the gun at his cousin. Carrasquillo yelled, "[R]un. He is going to shoot you." The defendant, kneeling on the ground, aimed and shot the victim in the head.

The defendant ran from the park with the rifle in his hand. A group of bystanders carried the victim to an automobile and drove him to Boston City Hospital. He died eleven days later, on August 16, 1974. On the day of the shooting, police recovered a rifle with a scope from bushes in the rear yard of a house near the park. Witnesses to the shooting, who testified that they were familiar with the defendant, known at the time as "Honduras," thereafter never saw the defendant in the park. In 1994, the defendant told a fellow inmate in an Indiana prison that he had shot and killed the victim.

1. *Pretrial motions.* The defendant claims error in the denial of his numerous pretrial motions, including motions to dismiss due to speedy trial violations, impairment of the grand jury, and loss of evidence; a motion to suppress statements based on alleged Miranda violations; and a motion for funds for an expert on identification. We examine each in turn.

a. *Speedy trial.* In 2002, claiming that the twenty-three-year delay between the issuance of the murder complaint in 1974 and his indictment in 1997 violated his constitutional right to a speedy trial, the defendant moved to dismiss the murder indictment. Following a hearing based solely on documentary evidence, a Superior Court judge (first judge) denied the motion on the ground that "the reason for the delay is attributable to [the] defendant's being a fugitive from justice." In so doing, the judge made extensive findings of fact, which we adopt as being well founded, after taking " 'an independent view' of the evidence and analyz[ing] its significance without deference." See *Commonwealth* v. *Clarke*, 461 Mass. 336, 341 (2012), citing *Commonwealth* v. *Bean*, 435 Mass. 708, 714 n.15 (2002).

i. *Facts found at hearing on motion to dismiss.* On August 17, 1974, a complaint for murder issued against the defendant in the Roxbury District Court. In September, 1974, the defendant, using the alias "Michael Sloane," was arrested in East Chicago, Indiana, and charged with robbery. He told East Chicago police that his name was Ivan Santa. On October 22, 1974, East Chicago police notified Boston police that a drifter had informed them that the defendant was wanted in Massachusetts for a murder in Roxbury.

After confirming that the man detained in Indiana was the

defendant, a Boston police detective mailed copies of three war-
rants for the defendant's arrest[1] to East Chicago police. On the
request of East Chicago police for certified copies of the war-
rants, Boston police sent an exemplified copy of the murder
warrant to act as a detainer. As of October 29, 1974, Boston
authorities planned to obtain an indictment for murder and then
to obtain a governor's warrant for the rendition of the defend-
ant. The assistant district attorney later decided, however, not to
indict the defendant until the East Chicago charge was resolved.
On March 14, 1975, the defendant was tried and acquitted of
the charge of robbery in East Chicago. He was then released by
East Chicago authorities without prior notice to Boston
authorities.

Between 1975 and 1994, the defendant was charged in Illi-
nois and Indiana with four different drug crimes under four dif-
ferent names. There is no evidence that the Commonwealth
knew of the defendant's location or undertook any efforts to
locate him during this period. In 1994, Boston police learned
that the defendant was again in the custody of the Indiana depart-
ment of correction. Two Boston police detectives traveled to an
Indiana prison and interviewed the defendant concerning the
1974 shooting. The defendant maintained that he was not the
man they sought, told police his name was Ivan Santa, and
claimed that he had never been to Boston. On February 12,
1996, Boston police informed authorities in the Indiana depart-
ment of correction that the defendant was still wanted for murder
in Massachusetts, and provided them with the murder warrant
to serve as a detainer. The next day, the defendant signed a
form acknowledging that Indiana authorities had informed him
of the detainer. On March 31, 1997, he waived extradition.
Boston police brought the defendant back to Massachusetts on
April 29, 1997, and he was indicted for murder on May 23,
1997.

ii. *Discussion.* On appeal, the defendant asserts that the first
judge erred in denying his motion to dismiss because the Com-

---

[1]The three warrants included the murder warrant, a warrant for assault with
intent to murder that had been issued after the shooting but prior to the
victim's death, and a warrant for possession of a class D substance with intent
to distribute.

monwealth failed to take him into custody despite knowing he was incarcerated in Indiana in 1974, and failed to do so again in 1994, and the delay prejudiced his defense.[2] The defendant having preserved his constitutional claim, we review to determine whether any error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Bacigalupo*, 455 Mass. 485, 495 (2009), citing *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163 (1998).

Under the Sixth Amendment to the United States Constitution and art. 11 of the Massachusetts Declaration of Rights, criminal defendants enjoy the right to a speedy trial. See *Commonwealth* v. *Dixon*, 458 Mass. 446, 459 (2010), citing *Commonwealth* v. *Gove*, 366 Mass. 351, 356 n.6 (1974), overruled on other grounds by *Commonwealth* v. *Butler*, *ante* 706 (2013) ("the speedy trial provision in art. 11 is coextensive with the Sixth Amendment"). The burden is on the defendant "to demonstrate prejudicial delay sufficient to warrant dismissal." *Commonwealth* v. *Gove*, *supra* at 361, citing *Commonwealth* v. *Jones*, 360 Mass. 498, 502 (1971), overruled on other grounds by *Commonwealth* v. *Butler*, *supra*.

We consider speedy trial claims using the nonexhaustive, four-part balancing test set forth by the United States Supreme Court in *Barker* v. *Wingo*, 407 U.S. 514, 530-532 (1972) (*Barker*). See *Commonwealth* v. *Look*, 379 Mass. 893, 897-898, cert. denied, 449 U.S. 827 (1980), overruled on other grounds

---

[2] The defendant was represented by several different attorneys during the seven-year period between indictment and trial. This may account for certain overlapping and duplicative filings. With respect to the assertion of his speedy trial rights, the defendant first moved on November 25, 2002, to dismiss the indictment in connection with the period of delay between 1974 and 1997. On April 15, 2004, he again moved to dismiss the indictment, pursuant to Mass. R. Crim. P. 36 (d) (3), 378 Mass. 906 (1978), and Article III of the Interstate Agreement on Detainers, St. 1965, c. 892, due to the delay between his interview with Boston authorities while incarcerated in Indiana in 1994 and his indictment in 1997. In December, 2004, the defendant moved again to dismiss the indictment, pursuant to Mass. R. Crim. P. 36 (d) (3), this time based solely on the delay following his 1997 indictment.

On appeal, the defendant relies only on constitutional speedy trial arguments, asserting no error as to the rulings on the motions to dismiss on speedy trial grounds, but summarily asserting that the facts of the case implicate his rights under Mass. R. Crim. P. 36 (b), 378 Mass. 906 (1978), and the Uniform Criminal Extradition Act, G. L. c. 276, §§ 11-20R. We consider the constitutional claim, as this is the only claim argued, but have satisfied ourselves, as we are required to do under G. L. c. 278, § 33E, that there was no error in the denials of the other speedy trial claims.

by *Commonwealth* v. *Butler*, *supra*. Under this framework, a reviewing court weighs (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker, supra* at 530. A defendant must first make a preliminary showing that he has suffered a delay that "has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay" before a court will consider the other factors. *Doggett* v. *United States*, 505 U.S. 647, 651-652 (1992) (*Doggett*), quoting *Barker, supra* at 530-531. Here, the defendant's speedy trial rights attached in 1974, upon the issuance of the complaint for murder by the Roxbury District Court, see *Commonwealth* v. *Butler, supra* at 708, resulting in a delay of over thirty years before trial. Such a delay is presumptively prejudicial and sufficient to trigger consideration of the other *Barker* factors.

A. *Length of delay*. The length of delay is considered both as an initial threshold for triggering a speedy trial analysis and as a factor of the analysis itself. Here, the thirty-year length of the delay is extraordinary, and weighs heavily in the defendant's favor.

B. *Reason for delay*. The United States Supreme Court has observed that "different weights should be assigned to different reasons" for a delay in bringing a defendant to trial. *Barker, supra* at 531. Weighing most heavily against the government would be "[a] deliberate attempt to delay the trial in order to hamper the defense." *Id*. At the other end of the spectrum are delays requested or otherwise orchestrated by the defendant, such as by evading capture by authorities. See *Commonwealth* v. *Anderson*, 9 Mass. App. Ct. 699, 705-706 (1980); *Ruffin* v. *State*, 284 Ga. 52, 59 (2008), cert. denied, 555 U.S. 1181 (2009). In between are more neutral reasons for delay attributable to the Commonwealth, "such as negligence or overcrowded courts [which] should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker, supra* at 531.

In evaluating the reasons for the delay in this case, we divide the thirty-year time span into three distinct periods: the two-year period from 1974 to 1975 when the defendant was incarcerated

in Indiana; the twenty-two-year period from 1975 until the defendant's return to Massachusetts in 1997; and the seven-year period between his indictment in 1997 and his trial in 2004.

1. *Period from 1974 to 1975.* The defendant maintains that the Commonwealth is at fault for failing to take him into custody and bring him to trial while it was aware that he was in the custody of Indiana authorities in 1974. It is unclear on this record why Indiana authorities released the defendant following his acquittal of the robbery charge. Boston police provided East Chicago police first with copies of warrants for the defendant's arrest, and then with an exemplified copy[3] of the murder warrant to serve as a detainer. This should have been sufficient to have prevented the defendant's release without notice to Boston authorities. See *Carchman* v. *Nash,* 473 U.S. 716, 719 (1985) ("detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent"). That Indiana authorities inexplicably allowed the defendant to go free upon his acquittal of the robbery charge, notwithstanding the Commonwealth's clear requests that the defendant be detained, is not attributable to the Commonwealth.

The defendant, however, maintains that it is immaterial whether it was Indiana or Massachusetts that was at fault for his release, since fault by one State actor should be attributable to them both. We have recognized that, insofar as the Commonwealth has the ability to coordinate amongst its various branches, it may in some circumstances be held responsible for the dilatory actions committed by any of its actors. Cf. *Commonwealth* v. *Butler, supra* at 715, quoting *Commonwealth* v. *Willis,* 21 Mass. App. Ct. 963, 964-965 (1986), quoting *Brady* v. *Maryland,* 291 Md. 261, 267 (1981) ("The Commonwealth, in the performance of its public trust . . . [has] some 'duty to coordinate the efforts of *its* various criminal divisions' " in attempting to locate a defendant [emphasis added]).

---

[3]See Black's Law Dictionary 385 (9th ed. 2009) (defining "exemplified copy" as a "duplicate of an original [usu(ally) official] document, certified as an exact reproduction usu[ally] by the officer responsible for issuing or keeping the original").

Such a rationale ordinarily has no application where, as here, the requisite coordination involves independent sister States over whom the Commonwealth has no control. Cf. *United States* v. *MacDonald*, 456 U.S. 1, 10 n.11 (1982) ("Of course, an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign"). Given that the Commonwealth timely lodged the requisite detainer with the Indiana authorities in 1974, we do not attribute to the Commonwealth the delay caused by Indiana's failure to detain the defendant in 1975 after he was acquitted of robbery, or to provide notice to the Commonwealth prior to his release.

2. *Period from 1975 to 1997.* There is no evidence that the Commonwealth again knew of the defendant's whereabouts until 1994, when Boston police visited him in prison in Indiana. During the 1994 interview concerning the shooting of Matos, the defendant denied both that his name was Rodolfo Carr and that he had ever been to Boston. From 1975 to 1997, when he was charged on a number of occasions with various drug crimes, the defendant used several different aliases. The record before us does not disclose whether the Commonwealth acted with diligence in searching for the defendant, and the defendant, who has the burden of proving prejudicial delay sufficient to warrant dismissal, does not suggest such a lack of diligence. See *Commonwealth* v. *Look, supra* at 898. In any event, the defendant's use of aliases with authorities in the Midwest, and his assertion of a false identity to Boston police, permit the inference that he was attempting to evade prosecution for the shooting during this period. See *Commonwealth* v. *Figueroa*, 451 Mass. 566, 580 (2008).

A defendant may not evade prosecution by intentionally and successfully delaying his trial and thereafter maintain that his constitutional right to a speedy trial has been violated by such delay. See *Commonwealth* v. *Loftis*, 361 Mass. 545, 549-550 (1972), citing *Shepard* v. *United States*, 163 F.2d 974, 976 (8th Cir. 1947) ("it would be unconscionable to permit the defendant to take advantage of a situation where a substantial part of the delay in the disposition of the cases was obviously caused by him, and in addition, was for his benefit"); *Commonwealth*

v. *Underwood*, 3 Mass. App. Ct. 522, 527-528 (1975) (time period in which defendant was "fugitive from justice" "must be excluded in any consideration of the delay in bringing the defendant to trial"). Even if the defendant's use of aliases was not motivated by an effort to evade prosecution in Massachusetts, his actions in that regard markedly decreased the likelihood that the Commonwealth would be able to locate him and bring him back for trial. Therefore, the period of delay from 1975 to 1997 does not weigh against the Commonwealth. See *Commonwealth v. Anderson*, 9 Mass. App. Ct. 699, 705 (1980) (rejecting claim of prejudicial delay where defendant provided false information to police that caused delay in his apprehension).

3. *Period from 1997 to 2004.* During the period between his indictment and trial, the defendant changed legal representation several times, was held for observation at Bridgewater State Hospital, filed numerous pretrial motions, and agreed to dozens of continuances. In his first motion to dismiss on speedy trial grounds, the defendant did not contend that this portion of the delay in bringing him to trial was attributable to the Commonwealth, and the first judge did not consider it as part of the defendant's claim.

The defendant did challenge this period of delay, however, in his third motion to dismiss on speedy trial grounds, argued before the trial judge. That motion was denied, based on the judge's determination that the Commonwealth was unilaterally responsible for only 156 days of delay during the seven-year period. The judge noted that the delay "ha[d] often been the result of [the defendant's] frequent requests for new counsel" and "the extensive time that was often needed to track down evidence and witnesses from thirty years ago." The defendant neither contests these findings nor suggests any reason why this period of delay is attributable to the Commonwealth.

C. *Defendant's assertion of his speedy trial right.* "A defendant's assertion of his speedy trial right is entitled to strong evidentiary weight," whereas the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker, supra* at 531-532. On the record before us, the defendant first asserted his right to a speedy trial on May 5, 2004, some seven years after his indictment, and ten

years after Boston police interviewed him in Indiana in connection with the shooting. Given this belated assertion of the right, combined with his extensive earlier use of aliases and his refusal in 1994 to acknowledge his identity to Boston police, this factor weighs heavily against the defendant. See *Barker, supra* at 536 ("barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates . . . that the defendant did not want a speedy trial"); *Commonwealth* v. *Beckett,* 373 Mass. 329, 333, 335 (1977) (no violation of right to speedy trial where no prejudice and "defendant has failed to show a diligent, or even casual, attempt to obtain a speedy trial").

D. *Prejudice to defendant by delay.* In considering whether a defendant has suffered prejudice by virtue of the delay in bringing him to trial, we look to the interests that the speedy trial right was designed to protect, namely "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker, supra* at 532.

Although the defendant was incarcerated for significant portions of the thirty-year period of delay, most of that incarceration was not as a pretrial detainee in Massachusetts. The defendant was incarcerated in the Midwest on unrelated charges on more than one occasion between 1974 and 1997, which can hardly be deemed "oppressive pretrial incarceration." To the extent such a consideration implicates the seven years of pretrial incarceration in Massachusetts, the defendant does not challenge the trial judge's finding that the Commonwealth was unilaterally responsible for only 156 days of delay during that period.

With regard to minimizing an accused's anxiety and concern, the defendant was either a fugitive from justice during the majority of this time, or was unaware of the charge of murder. As stated, the facts suggest the former. The anxiety suffered by a defendant evading prosecution does not implicate his right to a speedy trial. See *Barker, supra* at 534-536. Even assuming that the defendant was unaware of the murder charge until 1996, he would not have suffered prejudice during that period insofar as he would not have known the anxiety of awaiting a murder trial.

The defendant's claim of prejudicial delay rests primarily on the impairment of his defense, the final interest which the speedy trial right is designed to protect.[4] Where, as here, a defendant suffers an extraordinarily lengthy delay between formal accusation and trial, such delay "presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify," and therefore, "affirmative proof of particularized prejudice is not essential." *Doggett, supra* at 655. See *Commonwealth* v. *Green,* 353 Mass. 687, 690 (1968), citing *Petition of Provoo,* 17 F.R.D. 183, 203 (D. Md.), aff'd, 350 U.S. 857 (1955) ("Prejudice is necessarily inherent in any long delay"). Given the extraordinary thirty-year delay, we presume the defendant suffered prejudice. See *Doggett, supra.* Such prejudice, however, "cannot alone carry a Sixth Amendment claim," and is only "part of the mix of the relevant facts." *Id.* at 656.

Although thirty years between the issuance of a complaint and the commencement of trial is an exceptionally long delay, we nonetheless conclude, after having weighed the *Barker* factors, that the defendant's constitutional right to a speedy trial was not violated. It is plain that the defendant actively evaded prosecution for years, and, even when indicted in 1997, did not assert his right to a speedy trial until shortly before trial in 2004. See *Barker, supra*; *Beckett, supra* at 333. The record indicates that the defendant did not want a speedy trial.

b. *Grand jury testimony.* The defendant also filed two motions to dismiss the indictment on the ground of grand jury impairment.[5] In each, he maintained that the 1997 grand jury proceedings were impaired because the prosecutor knowingly or recklessly presented false or misleading testimony, and know-

---

[4]The defendant also appeals from the denial of his motion to dismiss based on the loss of evidence. See Part 1.C, *infra.* In affirming the denial of that motion, we conclude that the prejudicial effect of such lost evidence was speculative at best.

[5]On the record before us, it is unclear why the defendant was permitted twice to file substantially the same motion to dismiss, once by prior counsel and once by trial counsel. Although trial counsel's motion contains extensive legal argument largely absent from the first motion, the motions make nearly identical claims of error regarding the grand jury proceeding. In denying the defendant's second motion, the second judge repeatedly cited to and agreed with the first judge's conclusions.

ingly failed to present significant exculpatory evidence. On appeal, the defendant does not identify specific errors in the denial of these motions. Rather, he asserts broadly that the indictments should have been dismissed. There was no error.

"Dismissal of an indictment based on impairment of the grand jury proceedings requires proof of three elements: (1) the Commonwealth knowingly or recklessly presented false or deceptive evidence to the grand jury; (2) the evidence was presented for the purpose of obtaining an indictment; and (3) the evidence probably influenced the grand jury's decision to indict." *Commonwealth* v. *Silva*, 455 Mass. 503, 509 (2009), citing *Commonwealth* v. *Mayfield*, 390 Mass. 615, 620-622 (1986).

In both of his motions and on appeal, the defendant claimed that Stephen Murphy, a Boston police officer, testified falsely to the grand jury in 1997 when he stated that, at the time of the shooting in 1974, "officers spoke to people that had transported [the victim] to the [hospital], and they informed the police at that point in time that [the] young man known both as Rodolfo and as Honduras had been the person responsible for firing the rifle at [the victim]." The defendant points to directly conflicting evidence contained in contemporaneous police reports indicating that the bystanders who drove the victim to the hospital stated they did not see the incident happen.

The record, however, also indicates that Murphy had not been involved in the 1974 police investigation, and did not begin work on the case until 1994. The police reports served as the basis of Murphy's knowledge of the investigation that took place in the immediate aftermath of the shooting. Although the police reports plainly contradict Murphy's testimony concerning the individuals who transported the victim to the hospital, they also reflect that a man at the hospital identified the defendant as having been seen running in the area carrying a rifle shortly after the shooting. Thus, Murphy's grand jury testimony was neither without basis nor misleading in the manner the defendant suggests. In any event, given that the grand jury also heard testimony from four witnesses to the shooting who named the defendant as the shooter, Murphy's testimony before them is unlikely to have influenced their decision to indict. See *Silva*, *supra*.

The defendant also claims that both Murphy and Carrasquillo testified falsely to the grand jury when they said that, in 1974, Carrasquillo had identified the defendant as the shooter. In making this claim, the defendant relies upon conflicting portions of contemporaneous police reports stating that Carrasquillo had identified the shooter, not by name, but only as a "black male." The reports further indicate that an officer went to Carrasquillo's school shortly after the shooting to show him a photograph of the defendant, but was unable to do so because Carrasquillo had left the Commonwealth.

The record before us, however, also contains a letter written by a Boston police detective on January 6, 1975. That letter indicates that Boston police did show Carrasquillo a photographic array in the aftermath of the shooting, and that Carrasquillo identified a photograph of the defendant as the shooter. Given the ambiguity in the then twenty-year-old Boston police documents, the grand jury testimony that Carrasquillo contemporaneously identified the defendant as the shooter is not clearly false or misleading. Even if it were, it likely would have had minimal influence on the grand jury's decision to indict, in light of other testimony from Carrasquillo that he had seen the defendant shoot Matos, and similar testimony from three other witnesses who identified the defendant as the shooter.

Lastly, the defendant maintains that the grand jury proceedings were impaired because the Commonwealth failed to present significant exculpatory evidence. Specifically, he asserts that the grand jury were not informed that three of the witnesses who appeared before them and identified him as the shooter did not speak to police at the time of the shooting. "Prosecutors are not required in every instance to reveal all exculpatory evidence to a grand jury." *Commonwealth* v. *McGahee,* 393 Mass. 743, 746 (1985), citing *Commonwealth* v. *O'Dell,* 392 Mass. 445, 447 (1984). Rather, they must present only that exculpatory evidence that would "greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict." *Commonwealth* v. *McGahee, supra,* citing *Commonwealth* v. *Connor,* 392 Mass. 838, 854 (1984).

To be sure, the fact that three of the witnesses did not speak with police at the time of the shooting is pertinent to an assess-

ment of their credibility. Nonetheless, that alone does not mean that their grand jury testimony was false. In the circumstances, the failure to disclose the information is unlikely to have "greatly undermine[d]" the witnesses' grand jury testimony that they saw the defendant shoot Matos. Compare *Commonwealth* v. *O'Dell, supra* at 448-449 (grand jury impaired where Commonwealth intentionally omitted defendant's exculpatory comments in police report that was presented to grand jury). In addition to these three witnesses, the grand jury also heard testimony from Carrasquillo, who, as discussed, spoke with police immediately after the shooting and, according to his testimony and at least one police document, contemporaneously identified the defendant as the shooter.

We discern no error in the denial of the motions to dismiss the indictment predicated on impairment of the grand jury.

c. *Lost evidence.* Claiming that the loss of significant evidence violated his right to a fair trial, the defendant also moved prior to trial to dismiss the indictment on that ground.[6] "A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish a 'reasonable possibility based on concrete evidence rather than a fertile imagination that access to the [evidence] would have produced evidence favorable to his cause.' " *Commonwealth* v. *Cintron*, 438 Mass. 779, 784 (2003), citing *Commonwealth* v.

---

[6]The parties agree that the following items of physical evidence were missing at the time of trial: the rifle, scope, and live round recovered by Boston police near the park on the day of the shooting; results of fingerprint testing on the rifle; a bullet fragment found in the wall of a home near the park; a ballistics report comparing the bullet fragment to the rifle and live round; and any reports documenting an identification procedure by Carrasquillo. In addition, the parties agree that the following witnesses were unavailable to testify at trial: John Floyd (Boston police officer who responded to the hospital on the night of the shooting, interviewed the victim, and prepared the only remaining report from the day of the shooting); Joseph Dooley (Boston police detective who originally worked on the case and corresponded with Indiana authorities while the defendant was incarcerated there in 1974); Miguel Arredondo (deputy chief of the East Chicago, Indiana, police department who corresponded with Dooley while the defendant was incarcerated in East Chicago); and Joseph Kelley (Boston police detective who originally worked on the case). The Commonwealth was also unable to produce any reports documenting Boston police officers' interviews with the defendant in 1994, with witness Lillian Carrasquillo in 1997, and with witness Israel Gerena in 1997.

*Olszewski*, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994), and quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 2 (1984). "If he meets this initial burden, 'a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant.' " *Id.*, quoting *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). The Commonwealth is not required "to prove good faith or earnest efforts to preserve the evidence." *Commonwealth* v. *Willie*, *supra*. We will not disturb a judge's decision regarding the proper remedy for the loss of evidence absent a clear abuse of discretion. *Commonwealth* v. *Cintron*, *supra*, citing *Commonwealth* v. *Perito*, 417 Mass. 674, 684 (1994).

The defendant maintained that the missing rifle, ammunition, and bullet fragment prevented him from exploring whether such evidence could be exculpatory and whether it would comport with the version of events reported by witnesses to the shooting. He maintained also that the loss of the autopsy report similarly prevented him from exploring whether the gunshot wound was consistent with a shot from a rifle or from a handgun, while the missing copies of photographic arrays prevented him from exploring whether such arrays were impermissibly suggestive. Finally, the unavailability of John Floyd, a Boston police officer who prepared a report in the immediate aftermath of the shooting, prevented him from impeaching Carrasquillo at trial.[7]

Concluding that the missing evidence was not of any clear benefit to the defendant and, to the contrary, that it was more likely to prejudice the Commonwealth, the first judge denied the motion to dismiss. We discern no error or other abuse of discretion in the judge's determination that the missing evidence was neither clearly exculpatory nor of any demonstrable benefit to the defendant. The defendant offers little more than speculation to support his claim that access to the rifle, ammunition, and bullet fragment could have yielded favorable evidence, sug-

---

[7]Carrasquillo testified at trial that he identified the defendant to police both by the name "Honduras" and as "a black male." The police report prepared by Floyd, who was deceased by the time of trial, contained a statement that Carrasquillo had only identified the shooter as "a black male."

gesting, for instance, that the rifle might have yielded fingerprints other than his, notwithstanding a 1974 police report stating that there were no fingerprints on the rifle. See *Commonwealth* v. *Clemente*, 452 Mass. 295, 309 (2008), cert. denied, 555 U.S. 1181 (2009), citing *Commonwealth* v. *Dinkins*, 440 Mass. 715, 718 (2004) ("A claim that the evidence 'could have' or 'would have' assisted the defense is speculative at best").

With respect to the autopsy report, there is no dispute that the victim died of a gunshot wound to the head. The defendant offers no reason to think that such a report would have indicated whether the bullet was shot from a rifle or from a handgun. As to the photographic arrays, the defendant offers no basis for concluding that they were suggestive. Moreover, the witnesses knew the defendant from the neighborhood and witnessed the shooting in broad daylight; it is unlikely that suggestiveness would have played much of a role in their identifications. Cf. *Commonwealth* v. *Pressley*, 390 Mass. 617, 619 (1983) ("There may be cases in which the parties are so well known to each other . . . that under sufficient lighting and with appropriate physical proximity, the identification by the [witness] is either true or the [witness] is lying"). Lastly, the defendant was able to impeach Carrasquillo notwithstanding Floyd's unavailability, since the judge admitted Floyd's report in evidence "to show that Carlos Carrasquillo described the individual as a black male and did not identify him as Honduras."

Even had the defendant established a reasonable possibility that the missing evidence would have been favorable to his defense, the risk of prejudice was minimal where he was able, during cross-examination of the testifying police officers, to exploit the lost evidence by casting doubt on the thoroughness and accuracy of the police investigation. See *Commonwealth* v. *Dinkins*, *supra* at 719 (opportunity for defendant to "plant these seeds of doubt [regarding missing evidence] was undoubtedly a great deal more than [the defendant] would have accomplished had the evidence been available"). Defense counsel stated explicitly at a sidebar conference during his cross-examination of one of the police officers that he was setting up a defense pursuant to *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980) (*Bowden*). See *Commonwealth* v. *Fitzpatrick*, 463 Mass. 581,

597 (2012), citing *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 802 (2009) ("A '*Bowden* defense,' as it has commonly come to be known, may focus on either the failure of police to conduct certain scientific tests or their failure to investigate leads concerning suspects other than the defendant"). Accordingly, the defendant's motion to dismiss the indictment on the basis of lost evidence was properly denied.

d. *Motion to suppress defendant's statements.* The trial judge denied the defendant's motion to suppress on Miranda grounds the statements he had made to Boston police in 1994, while incarcerated in Indiana. On appeal, the defendant claims that the Commonwealth failed to prove beyond a reasonable doubt that Miranda warnings were provided and that he intelligently, voluntarily, and knowingly waived his Miranda rights.

After an evidentiary hearing, the judge found as follows. On March 22, 1994, two Boston police officers traveled to Pendleton, Indiana, to interview the defendant, who was serving a sentence at the Pendleton reformatory. The officers were dressed in plain clothes and waited for the defendant in a conference room. The superintendent of the facility asked the defendant whether he wished to speak to the Boston officers, and the defendant responded in the affirmative. He was brought into a fifteen- by twenty-five-foot conference room, where the Boston officers had his leg irons and handcuffs removed. The defendant and the two officers sat at a table. There was no one else in the room, and the defendant was not restrained.

The officers introduced themselves as Boston police detectives who were investigating the homicide of Matos in Boston twenty years previously. They told the defendant that they wanted to question him about the murder and whether he was responsible. One of the officers then read the defendant the Miranda warnings from a sheet and, after reading each right, asked the defendant whether he understood that right. Each time, the defendant responded that he did. He refused, however, to sign a Miranda waiver form or to allow the officers to tape record the conversation. The defendant subsequently told the officers that his name was Ivan Santa, that he was raised in New York, and that he had never been to Boston.

Relying on *Commonwealth* v. *Larkin*, 429 Mass. 426, 432 (1999) (*Larkin*), the judge concluded that the defendant was not in custody for purposes of Miranda, and therefore that Miranda warnings were not necessary. Even assuming he had been in custody, the judge determined that the officers adequately administered the Miranda warnings, and that the defendant made an intelligent, voluntary, and knowing waiver of his rights. The defendant neither contests the judge's conclusion that he was not in custody for Miranda purposes, nor provides any basis for concluding otherwise. Rather, he bases his claim of error solely on the adequacy of the warnings and thus whether he was truly able to waive rights of which he had not been properly advised.

"When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error." *Commonwealth* v. *Watson*, 455 Mass. 246, 250 (2009). "We make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." *Id.*

"The mere fact that a person is incarcerated does not automatically render that person 'in custody' for Miranda purposes." *Commonwealth* v. *Girouard*, 436 Mass. 657, 665 (2002), citing *Larkin, supra.* We consider instead, based on the totality of the circumstances, "whether the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life." *Larkin, supra* at 435, citing *Garcia* v. *Singletary*, 13 F.3d 1487, 1492 (11th Cir.), cert. denied, 513 U.S. 908 (1994), and quoting *People* v. *Margolies*, 125 Misc. 2d 1033, 1041 (N.Y. Sup. Ct. 1984). Here, where the defendant was offered the choice to speak or to decline to speak with the Boston officers, where his leg and hand restraints had been removed and he was not otherwise restrained, where he was interviewed by officials other than prison personnel, and where the interview occurred in a conference room rather than in his prison cell, it appears that the defendant was in fact less confined during the interview than he would otherwise have been in the course of ordinary prison life. See *Larkin, supra* at 435-436. We discern no error in the judge's determination that the defendant was not in custody for purposes of Miranda, and that, in any

event, adequate Miranda warnings were given and the defendant voluntarily, intelligently, and knowingly waived his rights. The motion to suppress was appropriately denied.

e. *Funds for expert witness.* The defendant argues that the second judge erred in denying his motion for funds pursuant to G. L. c. 261, § 27C. He sought the funds in order to obtain an expert on identification who could testify to the effect of the passage of thirty years on the memory of the witnesses and on their ability to identify the defendant. The judge determined that expert testimony on identification would not be helpful because "this is not a case of cross racial identification . . . [or] a case where the shooter was unknown to [the witnesses]." We review for abuse of discretion the judge's findings as to the reasonableness of a defendant's requests for G. L. c. 261, § 27C, funds. *Commonwealth* v. *Murphy*, 442 Mass. 485, 509-510 (2004).

Where an indigent defendant moves for funds to obtain an expert, a court "shall not deny any request with respect to extra fees and costs if it finds the [expert] is reasonably necessary to assure the applicant as effective a . . . defense . . . as he would have if he were financially able to pay." G. L. c. 261, § 27C (4). See *Commonwealth* v. *Matranga*, 455 Mass. 45, 50 (2009). "In determining whether to [allow such a motion,] a judge should consider not only the potential admissibility of the expert testimony and its cost, but also the 'desirability or necessity' of the testimony to the requesting party's case." *Commonwealth* v. *Zimmerman*, 441 Mass. 146, 152-153 (2004), quoting *Commonwealth* v. *Lockley*, 381 Mass. 156, 161 (1980).

The witnesses to the shooting testified to being familiar with the defendant because, prior to the shooting, they had seen him frequently in the neighborhood. While the passage of time would ordinarily be of concern when evaluating the credibility of identification testimony, the assistance of an expert is not always necessary for the jury to understand the effect of time on both a witness's memory and on his ability to make an identification. Where, as here, the witnesses were familiar with the defendant prior to the shooting, there is less reason for concern about the effect of the passage of time on their identifications. We cannot say that the judge abused her discretion in denying the motion for funds.

2. *Trial.* The defendant also claims error in certain evidentiary rulings at trial. We examine each in turn.

a. *Death certificate.* Over objection, the trial judge allowed the Commonwealth's motion in limine permitting the introduction of a medical examiner's death certificate of the victim as "prima facie evidence as to the cause of death," pursuant to G. L. c. 46, § 19.[8] The certificate was admitted absent the testimony of the medical examiner who prepared and signed it. The certificate states in pertinent part that the cause and manner of the victim's death was a "gunshot wound of the head with fracture of skull and perforation of the brain."

The defendant maintains that admission of the death certificate containing the medical examiner's statement violated his right to confrontation under the Sixth Amendment and art. 12 of the Massachusetts Declaration of Rights. Objection to the admission of the certificate on constitutional grounds having been preserved, we consider whether any error in its admission was harmless beyond a reasonable doubt.

"The confrontation clause bars the admission of testimonial out-of-court statements by a declarant who does not appear at trial unless the declarant is unavailable to testify and the defendant had an earlier opportunity to cross-examine him." *Commonwealth* v. *Simon*, 456 Mass. 280, 296, cert. denied, 131 S. Ct. 181 (2010), citing *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004). Since the defendant had no earlier opportunity to cross-examine the medical examiner, we consider whether the statements on the death certificate are testimonial. See *Commonwealth* v. *Simon*, *supra*. In deciding whether an out-of-court statement is testimonial, "[f]irst, we determine whether the statement is testimonial per se," that is, whether it was "made in a formal or solemnized form (such as a deposition, affidavit, confession, or prior testimony) or in response to law enforcement interrogation." *Id.* at 297, citing *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 13 (2005), cert. denied, 458 U.S. 926 (2006). "[I]f a statement is not testimonial per se, we consider whether the state-

---

[8]General Laws c. 46, § 19, provides that "[t]he record of the town clerk relative to a birth, marriage or death shall be prima facie evidence of the facts recorded, but nothing contained in the record of a death which has reference to the question of liability for causing the death shall be admissible in evidence."

ment is nonetheless testimonial in fact." *Id.*, citing *Commonwealth* v. *Gonsalves*, *supra* at 12. "A statement is testimonial in fact if 'a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime.' " *Id.*, quoting *Commonwealth* v. *Gonsalves*, *supra* at 12-13.

We need not decide whether the certificate was testimonial per se since it is clear that the statement made by the medical examiner contained in the death certificate was testimonial in fact. See *Commonwealth* v. *Gonsalves*, *supra* at 11-13. In circumstances where a victim has undoubtedly died an unnatural death, a medical examiner who makes a statement regarding the cause of a victim's death could reasonably anticipate that such statement would likely be used in a criminal trial. See *United States* v. *Williams*, 740 F. Supp. 2d 4, 7 (D.D.C. 2010) ("death certificate[s] . . . fit squarely within the definition of testimonial statements"). Cf. *Commonwealth* v. *Avila*, 454 Mass. 744, 762 (2009), citing *Commonwealth* v. *Nardi*, 452 Mass. 379, 394 (2008). Although death certificates are statutorily required for all deaths, see G. L. c. 46, § 9, where the death resulted from an obvious homicide, it is reasonable to expect that the death certificate will be used as evidence at trial. See *United States* v. *Williams*, *supra* at 7-8. Contrast *Commonwealth* v. *Zeininger*, 459 Mass. 775, 787-788, cert. denied, 132 S. Ct. 462 (2011), quoting *Michigan* v. *Bryant*, 131 S. Ct. 1143, 1155 (2011) (certificates attesting to proper functioning of blood alcohol testing machinery "are maintained in the routine administration of the affairs of an administrative agency tasked with quality control, and [thus are not deemed evidence] 'taken for use at trial' ").

This is all the more so when it is a medical examiner who prepares a death certificate in circumstances where, as here, the victim died of a gunshot wound to the head. By statute, the duty of a medical examiner is to "conduct appropriate *medicolegal* investigations within the [C]ommonwealth," including "the investigation and certification as to the cause of deaths under their jurisdiction [emphasis supplied]." G. L. c. 38, § 2. The medical examiner would fully anticipate that statements he made that are contained in the death certificate as to the cause

of death will later be used in a criminal proceeding. See *Commonwealth* v. *Gonsalves, supra.*

While the admission of the death certificate absent the medical examiner's testimony thus violated the defendant's right to confrontation, the cause of death was not a disputed issue at trial. Four witnesses testified that they saw the defendant shoot the victim in the head and also testified to visiting the victim in the hospital and to his subsequent death eleven days after the shooting. In these circumstances, we are satisfied that the admission of the death certificate was harmless beyond a reasonable doubt.

b. *In-court identifications.* The defendant argues that the judge erred in permitting what he claims were impermissibly suggestive in-court identifications by witnesses to the shooting. "We have long recognized that 'a degree of suggestiveness inheres in any identification of a suspect who is isolated in a court room.' " *Commonwealth* v. *Choeurn,* 446 Mass. 510, 519-520 (2006), quoting *Commonwealth* v. *Napolitano,* 378 Mass. 599, 604 (1979). Such in-court identifications are not, however, impermissibly suggestive per se. *Commonwealth* v. *Choeurn, supra.* "Rather, an in-court identification is excluded if it is tainted by an out-of-court confrontation arranged by the Commonwealth that is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " *Id.* at 520, quoting *Simmons* v. *United States,* 390 U.S. 377, 384 (1968).

The defendant does not suggest any improper out-of-court identification procedures that might have tainted the in-court identifications here. Rather, he argues that the two witnesses who made such identifications were "motivated to do so by considerations entirely unrelated to the case" (favorable treatment in sentencing on pending criminal cases against one of the witnesses, who was the brother of another witness). Such alleged motivations provide a basis to question the credibility of the witnesses at trial, as the defendant did during cross-examination, but do not demonstrate, without more, that the identification procedure was improper. Accordingly, we discern no error in the judge's decision to allow the in-court identifications of the defendant.

The defendant alleges also that the judge erroneously permitted a witness, Wayne Rock, to state in connection with his in-court identification of the defendant that he was a Boston police officer.[9] Rock was able to identify the defendant not because of his employment in law enforcement but only because they had attended the same high school many years before. In addition to his testimony identifying the defendant in court as the same person he had known in high school, and as the same person depicted in a police wanted poster containing a picture of the defendant from the 1970's,[10] Rock's identification testimony was linked to his work as a police officer. He testified that it was while he was working as a police officer that he had looked at the wanted poster, and that in 1997, while assigned to the homicide unit, he was asked questions by members of the cold case squad about his having known the defendant in the 1970's. He also testified that on April 29, 1997, "in [his] capacity as a homicide detective," he picked up the defendant and two other officers at Logan Airport. No objections were lodged to these questions.[11]

The witness was asked more than the brief and ordinarily

[9]At the beginning of its direct examination of Wayne Rock, the prosecution asked Rock questions about his employment, eliciting detailed information that he had been employed since 1985 as a Boston police officer and as a detective since 1990, that he had previously been assigned to two different areas in Boston and to the district attorney's special investigation unit and the homicide unit, and that he was currently working in the cold case squad in the homicide unit.

[10]Two of the witnesses to the shooting, brother and sister Carlos and Lillian Carrasquillo, were unable to make an in-court identification of the defendant as the same person they witnessed shoot the victim thirty years prior. Wayne Rock's testimony was therefore relevant to show that the defendant, although perhaps different in appearance due to the thirty-year time lapse, was the same Rodolfo Carr who was a teenager in the Roxbury section of Boston in the early 1970s. (Because Carlos Carrasquillo's testimony is discussed in a number of contexts throughout the decision, whereas discussion of Lillian Carrasquillo's testimony is limited to this issue, elsewhere in the opinion we refer to him by his last name.)

[11]At the end of the third day of trial, the Commonwealth called Rock to testify. Before Rock took the stand, the defendant objected to his testimony in part on the ground that the identification itself was not admissible and in part because Rock should not be permitted to testify that he is a police officer. The judge indicated that she would permit the identification testimony but deferred ruling on the objection relating to Rock informing the jury as to his line of work. Prior to Rock's testimony the next day, the judge stated, "we stayed

permissible preliminary questions concerning employment to be expected of a lay witness. The detailed employment information elicited and the manner in which it was tied to Rock's identification testimony carried the unnecessary risk of inappropriate prejudice. See *Commonwealth* v. *Pleas*, 49 Mass. App. Ct. 321, 327 (2000) ("Identification testimony from a police officer who is so designated increase[d] the potential for inappropriate prejudice to the defendant"); *United States* v. *Butcher*, 557 F.2d 666, 669 (9th Cir. 1977) ("the use of identifications by the police officers, while constitutionally permissible, did increase the possibility of prejudice to the defendant in that he was presented as a person subject to a certain degree of police scrutiny").

Where, as here, the basis of a witness's identification is entirely unrelated to his employment in law enforcement, such potential prejudice may readily be avoided. Since Rock's identification of the defendant was based solely on having attended high school with him, the detailed employment testimony provided no relevant or valuable context for understanding the identification. However, where the jury also heard testimony from four witnesses to the shooting, and from a witness who testified to hearing the defendant's confession to the killing, Rock's testimony was of comparatively minor probative value. The error had "but very slight effect" on the jury, and, even assuming the error had been preserved, was not prejudicial. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

3. *Ineffective assistance of counsel.* We turn to the defendant's claim that his counsel was ineffective. "We examine the defendant's claim of ineffective assistance of counsel under G. L. c. 278, § 33E, which is more favorable to a defendant than the Federal or State constitutional standards." *Commonwealth* v. *Mosher*, 455 Mass. 811, 827 (2010), citing *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001). Where, as here, the defendant did not file a motion for a new trial, and did not supplement the record with an affidavit of his trial counsel,

last evening and I understand that [Rock's testimony] is no longer a concern of the Court, no longer a live issue; is that right?" To which the defendant responded, "Correct." During Rock's testimony, the only objection lodged was as to the identification of the defendant in connection with the wanted poster.

"we review the trial record alone to determine whether a defense counsel's strategic or tactical decision questioned on appeal was manifestly unreasonable when made and, if so, whether the unreasonable decision resulted in a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Brown*, 462 Mass. 620, 629 (2012), citing *Commonwealth* v. *Boateng*, 438 Mass. 498, 598 (2003). "We keep in mind that an ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight." *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002).

a. *Failure to impeach a witness.* The defendant alleges that his trial counsel was ineffective for failing to impeach Boston police Officer Murphy with the grand jury testimony in which he testified that the individuals who drove the victim to the hospital told police that the defendant was the shooter. "Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on [G. L. c. 278,] § 33E[,] review, still show deference." *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001).

As discussed *supra*, while Boston police records indicate that the individuals who drove the victim to the hospital did not see the shooting, at least one person at the hospital saw the defendant running near the park with a rifle in his hand shortly after the shooting. If defense counsel had attempted to impeach Murphy concerning his grand jury testimony, counsel risked opening the door for the Commonwealth to admit those portions of the Boston police report containing statements that a witness saw the defendant running with a gun in his hand shortly after the shooting. Avoiding such a risk at the expense of not impeaching Murphy on a relatively minor point was not manifestly unreasonable. See *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997) ("In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance").

b. *Mugshot.* The defendant argues his trial counsel was ineffective for failing to sanitize or challenge the authenticity of a

Boston police photograph of the defendant that was admitted in evidence. "Mugshots may be admitted in evidence if the prosecution shows some need for their introduction, they are offered in a form that does not imply a prior criminal record, and the manner of their introduction does not call attention to their source." *Commonwealth* v. *McAfee*, 430 Mass. 483, 493 (1999).

Contrary to the defendant's claim, trial counsel successfully moved to have the photograph sanitized, removing all words except "Boston Police." The retention of those words was not prejudicial per se, since the words, standing alone, do not indicate the purpose for which the photograph was taken. See *Commonwealth* v. *Martin*, 447 Mass. 274, 286 (2006). We cannot say on this basis that counsel was ineffective.[12]

c. *Additional witnesses.* The defendant contends also that counsel was ineffective for failing to call Boston police Officer Thomas Cashman. He claims that Cashman's testimony could have been used to impeach Carrasquillo's trial testimony that, in 1974, he identified the defendant from a photographic array that police showed him at school. "[I]neffective assistance of counsel is not established merely by showing that the defendant's counsel did not call additional witnesses." *Commonwealth* v. *Ortega*, 441 Mass. 170, 178 (2004). "To prevail, the defendant must show that the purported testimony would have been relevant or helpful." *Id.*, citing *Commonwealth* v. *Beauchamp*, 49 Mass. App. Ct. 591, 609-610 & n.23 (2000).

The defendant relies on a police report submitted by Cashman in 1974 in which he states that he was unable to locate Carrasquillo at his school because Carrasquillo had left the Commonwealth. As discussed *supra*, however, the record also contains a letter written by a Boston police officer stating that Carrasquillo did identify the defendant from a photographic array shown to him by Boston police. The defendant did not provide an affidavit from Cashman regarding the nature of any testimony he would have offered at trial. See *Commonwealth* v. *Ortega*,

---

[12]The defendant also asserts trial counsel should have objected to the photograph because it is of "suspicious origin," a claim based purely on speculation. See *Commonwealth* v. *Watson*, 455 Mass. 246, 256 (2009) ("mere speculation, without more, is insufficient to establish ineffective representation").

*supra* at 177-179 (denying defendant's claim where he "provided no affidavits from any of the prospective witnesses setting forth the testimony they would have given had they been called as witnesses"). Nor did the defendant establish that Cashman's testimony would have been particularly helpful to his defense, since one officer's account of a failed attempt to locate Carrasquillo at his school does not logically imply that no other police officer ever contacted him at that school. As such, the defendant has not established that Cashman's testimony would have been helpful.

The defendant claims also that trial counsel should have called the defendant's sister to impeach Carrasquillo's testimony. Carrasquillo testified that he knew the defendant in part because he had gone to school with the defendant's sister, "Oneda." The defendant provided an affidavit from his sister in which she stated that she is the defendant's only sister, that there is no person in their family named "Oneda" or "Oneida," and that she was born on March 28, 1974, meaning that she was less than five months old at the time of the shooting. While this testimony could have been used to impeach Carrasquillo's claim that he went to school with the defendant's sister, it is of marginal value given that Carrasquillo testified that he also knew the defendant because he saw him every day in the park. In light of this, we cannot say that trial counsel rendered ineffective assistance by not having called the sister to testify. See *Commonwealth* v. *Ortega, supra.*

d. *Consciousness of guilt instruction.* Finally, the defendant claims trial counsel was ineffective for failing to request a jury instruction on consciousness of guilt, in view of the evidence regarding his flight from the neighborhood after the shooting, and his subsequent incarceration in Indiana. Whether to request a consciousness of guilt instruction is a matter of trial tactics. See *Commonwealth* v. *Simmons,* 419 Mass. 426, 435-436 (1995); *Commonwealth* v. *Clark,* 20 Mass. App. Ct. 392, 396 (1985).

"A defense attorney . . . might not want to request a consciousness of guilt charge if none is requested by the Commonwealth or given, sua sponte, by the judge. Defense counsel might feel that it would not assist the defendant's case to have the judge focus the jury's attention on such matters as flight or

concealment, even with the cautionary language on how the evidence is to be weighed." *Commonwealth* v. *Simmons*, *supra* at 435. The Commonwealth did not ask for such an instruction in this case, and the judge did not give one sua sponte. On the facts before us, it was not manifestly unreasonable to forgo an instruction on consciousness in order to avoid drawing the jury's attention one last time to the evidence of the defendant's flight from Massachusetts.

4. *Defendant's claim under* Commonwealth v. Moffett. The defendant, in what he characterizes as a brief filed pursuant to *Commonwealth* v. *Moffett*, 383 Mass. 201 (1981), asserts numerous additional trial errors and claims of ineffective assistance of counsel. We discern no error as to any of these claims.[13]

5. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record and conclude that there is no basis to exercise our authority pursuant to G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree or to order a new trial.

*Judgment affirmed.*

---

[13]Because we discern no error, "we need not address the Commonwealth's contention that our decision in *Commonwealth* v. *Moffett*, 383 Mass. 201, 208, 216-217 (1981), was not intended to permit 'hybrid representation' and that we should not consider these claims of error." *Commonwealth* v. *Brown*, 462 Mass. 620, 634 n.14 (2012).