## Commonwealth vs. Cornelius Brown.

Suffolk. January 9, 2012. - June 28, 2012.

Present: IRELAND, C.J., BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Firearms. Constitutional Law,* Voluntariness of statement. *Practice, Criminal,* Capital case, Motion to suppress, Voluntariness of statement, Assistance of counsel, Request for jury instructions, Instructions to jury, Conduct of judge. *Intoxication. Evidence,* Voluntariness of statement, Intoxication, Relevancy and materiality, Prior misconduct, Intent. *Intent.*

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements he made to police officers following his arrest, brought on the ground that his level of intoxication was so severe as to render his statements involuntary, where, while the defendant's speech was sluggish from the influence of drugs, there was nothing to suggest that he was acting irrationally or was out of control, or that his denials were induced by psychological coercion. [625-627]

At a murder trial, defense counsel was not ineffective in failing to object to the admission in evidence of the defendant's prior incarceration, and no substantial likelihood of a miscarriage of justice arose from this evidence, where the evidence was highly probative of the accuracy of a witness's identification of the defendant as the man who fled the scene with a gun in hand only seconds after shots were fired; and where the modest risk of any unfair prejudice was mitigated by the length of time between the defendant's incarceration and the killing, the absence of any reference to the incarceration in the prosecutor's closing argument, and the judge's limiting instruction. [627-628]

At a murder trial, defense counsel was not ineffective in failing to request jury instructions on voluntary or involuntary manslaughter, and the absence of such instructions did not give rise to a substantial likelihood of a miscarriage of justice, where it was not manifestly unreasonable for counsel, with the informed consent of the defendant, to decide to focus the jury on the defense of mistaken identity and avoid diluting that defense with a suggestion that the defendant used excessive force in self-defense or recklessly fired the shots with no intent to kill or grievously injure. [629-631]

At a criminal trial, the judge did not err in admonishing defense counsel for improper argument during opening statement, nor was it improper for the judge to call defense counsel to sidebar when he asked a question that the witness essentially had just answered; further, the judge did not act unfairly in warning defense counsel, but not the prosecutor, as to how much time he had left in his closing argument; finally, the judge's critical comments to defense counsel did not create a substantial likelihood of a miscarriage of justice. [631-634]

There was no merit to a criminal defendant's claims that the judge at the defendant's trial erred in his final instructions to the jury. [634]

At a criminal trial, defense counsel's cryptic remarks during his opening statement did not create a substantial likelihood of a miscarriage of justice. [634-635]


INDICTMENTS found and returned in the Superior Court Department on November 16, 2007.

A pretrial motion to suppress evidence was heard by *Regina L. Quinlan*, J., and the cases were tried before *Thomas E. Connolly*, J.

*Stephen Neyman* for the defendant.

*Donna Jalbert Patalano*, Assistant District Attorney, for the Commonwealth.

GANTS, J. In the early evening on July 4, 2007, twenty-two year old Michael Wiggins was shot while he watched a fistfight on a street in a Dorchester neighborhood in Boston. He later died of his wounds. The defendant was charged with the killing and was convicted by a Superior Court jury of murder in the first degree on a theory of deliberate premeditation, in violation of G. L. c. 265, § 1.[1]

The defendant presents four primary claims on appeal. First, he claims error in the denial of his motion to suppress, which contended that the statements he made to the police following his arrest were involuntary. Second, he argues that his attorney was ineffective in failing to object to the admission of evidence that the defendant was in the same unit at the Suffolk County house of correction as an eyewitness who identified the defendant as the person fleeing the scene of the shooting with a gun in his hand. Third, he claims that his attorney was ineffective in failing to request jury instructions on voluntary or involuntary manslaughter. Fourth, he contends that the trial judge created a substantial likelihood of a miscarriage of justice by making "gratuitous interjections" to the defendant's opening statement,

---

[1] The defendant was also convicted of unlawful carrying of a firearm, in violation of G. L. c. 269, § 10 (*a*), and unlawful possession of ammunition, in violation of G. L. c. 269, § 10 (*h*). He was sentenced to from four to five years in State prison on the firearm conviction. The ammunition conviction was filed without the imposition of sentence with the defendant's consent.

his examination of witnesses, and his closing argument. The defendant, in a separate brief that he contends is filed in accordance with *Commonwealth* v. *Moffett*, 383 Mass. 201 (1981), also challenges various instructions provided in the judge's final instructions to the jury. Finally, the defendant argues that we should exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdict. For the reasons detailed below, we affirm the convictions and, after a complete review of the record, decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

*Background.* We summarize the evidence at trial, reserving certain details for our analysis of the issues raised on appeal.

On July 4, 2007, Pamela Wiggins invited her large extended family to her home at 14 Arbutus Street in Dorchester for a family cookout. Approximately fifty family members and friends attended, including Pamela's niece, Anita Mitchell; Anita's boy friend, Dante Webb; and three of Webb's friends, one of whom was the defendant.[2]

Webb got into a verbal argument in the back yard of Pamela's house with Pamela's brother, Ariel. The argument continued after Ariel and Webb moved to the front of Pamela's house and to the corner of Arbutus and Ashton Streets. The dispute turned violent when Pamela's nephew, Keith, struck Webb in the head with a bottle. A fistfight followed on the street corner, with Keith and Ariel battling Webb, and Anita trying unsuccessfully to break up the fight.

The fight abruptly ended when two or three gunshots were heard in rapid succession, and the participants ran, except for Anita, who stood stunned. Two of the shots hit the victim, a bystander who had been watching the fistfight. The victim lay on the ground, with gunshot wounds to his torso and right arm. He was taken by ambulance to a hospital, where he died from his gunshot wounds on July 10.[3]

None of the participants in the fistfight had displayed a

---

[2]We will often use only the first names of witnesses because many who attended the cookout share the same surname.

[3]The parties stipulated that the victim's death was caused by the gunshot wounds. No firearm was left at the scene, and the murder weapon was never recovered.

firearm, and none was left at the scene.[4] The only firearm that was seen after the shooting was carried by a stocky African-American man wearing a white T-shirt and a baseball cap who walked and later ran up Arbutus Street in the direction of Blue Hill Avenue.

Numerous witnesses saw this man. Pamela's adult daughter, Raquel, identified the defendant as the shooter. She had seen the defendant two or three times before the cookout, and she had photographed him in March, 2007. She recognized him right away when he arrived at the cookout with friends. He flirted briefly with her, and she photographed him standing with Ariel and one of the defendant's friends.[5] As she stood watching the fistfight, she saw the defendant with a revolver in his hand approach the victim from behind on Ashton Street, aim at the victim, fire at least twice, and then walk away on Arbutus Street heading toward Blue Hill Avenue.[6] When the police questioned her at the scene, she said that she would speak with Officer Walter Mitchell, a police officer she had known since she was a child. On July 7, she provided him with four photographs, including the photograph of the defendant she had taken at the cookout and the earlier photograph of him she had taken in March, 2007. Raquel identified the defendant as the person in the photographs responsible for the shooting on July 4. On July 31, Raquel identified the defendant in a photographic array, saying that she was "one hundred per cent sure" that the person she identified was the man with the gun who had shot her cousin.

Ariel had been "locked up together" with the defendant in the same unit at the Suffolk County house of correction for "a few months" in 1997. Ariel "recognized him right away" when the defendant arrived at the party, and they "greeted each other with a handshake." Ariel did not see who fired the gunshots while he was fighting with Webb, but he saw the defendant's

---

[4]Anita Mitchell testified that she saw Dante Webb put a semiautomatic pistol "on his waist" as they prepared to go to the cookout, but she never saw it in his hand at the cookout.

[5]The watch worn by the defendant's friend indicated that the photograph was taken at 7:05 P.M.; the dispatch for the ambulance was received at 7:24 P.M.

[6]Raquel testified that the victim was standing near a vehicle parked on Ashton Street near the corner of Arbutus Street and had just put down the plate of food he was eating when he was shot.

back and "a partial profile" as he was "going up" Arbutus Street toward Blue Hill Avenue with a gun in his hand three to five seconds after the shots were fired. Ariel later picked the defendant from a photographic array as the person he saw with the gun seconds after the shooting, writing on the back of the defendant's photograph, "100%. That's the dude."

Naeemah Mitchell had stood close to the shooter, who wore a white T-shirt and a "B" baseball cap,[7] when he fired three times "towards [the victim], towards the fight" with an "old fashioned" handgun. She testified that the shooter did not appear to be aiming at any particular person; he just pulled out a gun and started firing, backing up as he fired, and then fled on Arbutus Street toward Blue Hill Avenue. Naeemah also testified that, while the victim was still in the hospital, she had seen the photographs Raquel had taken, and identified the defendant as the shooter in the photograph later turned over to police. However, when she was shown a photographic array on August 8, 2007, Naeemah did not identify the defendant as the shooter but identified another man who resembled the defendant.

Shalanda Fenner was driving in her vehicle at the intersection of Arbutus and Ashton Streets when she saw a husky African-American man with a white T-shirt and a black baseball cap aim a gun and fire twice. She noted that he did not fire in the direction of the area where the fighting was taking place, and that the shooter was only a few feet from the person who was shot. The victim was in a "bubble" around the fight but was not involved in the fight and was holding a plate of food in his hand. After he fired, the shooter went up Arbutus Street, toward Blue Hill Avenue.

A defense eyewitness, Shirley Sweeney, testified that the husky man with a gun running on Arbutus Street toward Blue Hill Avenue wore a white T-shirt and blue jeans and had shoulder-length hair. In the photograph taken of the defendant at the cookout, he did not have shoulder-length hair.

Sometime after July 4, the defendant arrived at Veronica Copeland's home in Brockton and remained there until the

[7]In the July 4 photograph taken by Raquel, the defendant is wearing a white T-shirt with a red embroidered "B" and baseball, and a white baseball cap with a red "B" over a light red background.

morning of August 17, 2007. He told her that, on July 4, he was at a cookout, someone hit his friend over the head with a bottle during an altercation, and "they were going to shoot him, but he shot in self-defense." On July 5 or 6, the defendant telephoned his sister, Dareline Jackson, and told her that "something bad had happened" and he would not see her "for a while." He explained that "some shit happened that I'm getting blamed for."

The defendant told Dawneca Simpson, the mother of his child, that he was "lying low" because he "got caught up in something" in Boston. When the police came to her home in Brockton on August 17, 2007, after having obtained an arrest warrant for the defendant, she telephoned him, told him that the police were looking to arrest him for murder, and asked whether he was going to turn himself in. He said, "No," and ended the telephone call.

The defendant arrived with no prior notice at Lisa Allen's home in Bridgewater on August 17. He carried a small bag with clothes and other personal belongings, and he said that he needed a place to stay for a couple of days. Allen allowed him inside. She later overheard the defendant say on the telephone, "I have a bad feeling about today. Tell ma I'm not going to see her for a long time." The police arrived at Allen's home about two hours after the defendant's arrival and asked to search her home for the defendant. She consented to the search, and the police located the defendant in a rear bedroom, where he was arrested.

*Discussion.* 1. *Motion to suppress the defendant's statements to police.* Before trial, the defendant moved to suppress his statements to the police following his arrest, claiming that the statements were involuntary. We find no error in the judge's ruling denying the defendant's motion to suppress.

After his arrest, the defendant was transported by the police to Boston and brought to an interview room in the homicide unit at police headquarters, where he was met by Detective Dennis Harris and Sergeant Detective Richard Dailey. Only Detective Harris testified at the evidentiary hearing on the motion, and his testimony in all relevant respects was identical to his testimony at trial.

The motion judge (who was not the trial judge) found that,

when the defendant met with Detective Harris and Sergeant Detective Dailey, his handcuffs were removed and he was given the water he had requested. The defendant declined orally and in writing the invitation to record the interview electronically, and waived orally and in writing his Miranda rights. During the interview, the defendant volunteered that he had consumed "some weed" and "a couple of Vicodins" "for pleasure" two hours before the interview. The defendant's responses to questions were "sluggish and slow," and his demeanor was consistent with having smoked marijuana, but the responses were "appropriate," and there were no unusual delays or hesitations. The defendant was told that they were investigating a shooting at a party on Arbutus Street. He replied that he did not know anybody on Arbutus Street. After being told that he was charged with murder as a result of the shooting at the party on Arbutus Street, the defendant responded that he had nothing to say because he was not there that day. He then invited Detective Harris to continue talking, which the detective did, but the defendant did not make any response. The defendant terminated the interview fifteen minutes after it started by stating that he did not want to talk to the detectives and that he wanted a lawyer and a telephone call. When the defendant then walked to the front desk to make his telephone call, he was steady on his feet.

The judge denied the motion to suppress, concluding that, while the defendant was under the influence of drugs during the interview, "there was nothing in the defendant's demeanor or his responses which would indicate that his level of intoxication was so severe as to render his statements involuntary."

"We review the judge's conclusion under the familiar standard used in reviewing a motion to suppress: we accept as true the subsidiary findings of fact made by the judge absent clear error, but make our own independent determination on the judge's 'application of constitutional principles to the facts as found.' " *Commonwealth* v. *Peters*, 453 Mass. 818, 822-823 (2009), quoting *Commonwealth* v. *Stoute*, 422 Mass. 782, 783 n.1 (1996). In determining whether a defendant's statement was freely and voluntarily given, a judge must consider the totality of the relevant circumstances, including the defendant's physical and mental condition, the defendant's conduct, and the details of the

interrogation. *Commonwealth* v. *Parker*, 402 Mass. 333, 340 (1988), *S.C.*, 412 Mass. 353 (1992) and 420 Mass. 242 (1995). While special care must be taken to assess the voluntariness of a defendant's statement where there is evidence that he was under the influence of alcohol or drugs, an "otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs." *Commonwealth* v. *Silanskas*, 433 Mass. 678, 685 (2001), quoting *Commonwealth* v. *Shipps*, 399 Mass. 820, 826 (1987).

Here, the defendant had the presence of mind to deny knowing anyone who lives on Arbutus Street, to claim no knowledge of the shooting at the party, and to invoke his rights to silence, to an attorney, and to a telephone call. While his speech was sluggish from the influence of drugs, there is nothing to suggest that he was acting irrationally or was out of control, or that his denials were induced by psychological coercion. See *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554-555 (2001). We see no error in the judge's finding of voluntariness.

2. *Admission of evidence of the defendant's prior incarceration.* The defendant claims that his attorney was ineffective in failing to object to the admission in evidence of the defendant's prior incarceration, and that this evidence produced a substantial likelihood of a miscarriage of justice.

Evidence of the defendant's prior incarceration was presented through two witnesses. Ariel testified that he knew the defendant because they were jailed in the same unit for a few months in 1996 or 1997. This testimony was corroborated by the records supervisor of the Suffolk County sheriff's department, who testified from jail records that the defendant and Ariel were both in custody at the Suffolk County house of correction from January 23, 1997, to April 14, 1998, and again from September 14 to September 21, 1998, and were in the same unit from January 23 to February 6, 1997, and again from February 10 to April 11, 1997. Defense counsel did not object to this testimony or ask for a limiting instruction when the evidence was admitted. During the charge conference, defense counsel asked that the judge not provide a limiting instruction regarding this evidence, but the judge nonetheless instructed the jury that they may not infer from this evidence "that the defendant has any propensity

for crime or that he is a bad man" and that the evidence was offered only to show that Ariel "may have known the defendant and been able to identify him." The defendant ultimately did not object to this limiting instruction.

Evidence of a defendant's prior incarceration may be admitted if it is offered for a relevant purpose other than to show the defendant's criminal propensity or bad character, and if the probative value of its relevant purpose outweighs the risk of unfair prejudice. See *Commonwealth* v. *Mullane*, 445 Mass. 702, 708-709 (2006); *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986), and cases cited. See generally Mass. G. Evid. § 404(b) (2012). Here, the evidence was highly probative of the accuracy of Ariel's identification of the defendant as the man who fled the scene with a gun in hand only seconds after shots were fired. Ariel based this identification on seeing the back and a "partial profile" of the fleeing man, so it was important whether Ariel knew the defendant well enough to make an accurate identification from this vantage point. Ariel potentially could have testified to his familiarity with the defendant without identifying its source, but Ariel's claim of familiarity is far more persuasive where it is corroborated by evidence that he and the defendant served time in the same unit when they were incarcerated.

The risk of any unfair prejudice is mitigated by the length of time between the defendant's incarceration and the killing (nearly nine years), the absence of any reference to the incarceration in the prosecutor's closing argument, and, most importantly, the judge's limiting instruction, which forbade the jury from considering this evidence for any purpose other than identification. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 834-835 (2006); *Commonwealth* v. *Jackson*, 428 Mass. 455, 459-460 (1998).

Because of the probative weight of this testimony in evaluating the accuracy of the identification of a key eyewitness and the modest risk of unfair prejudice, we conclude that the judge did not abuse his discretion in admitting this testimony and limiting its use. Therefore, we conclude that no substantial likelihood of a miscarriage of justice arose from defense counsel's failure to object to the admission of this evidence. See *Commonwealth* v. *McCowen*, 458 Mass. 461, 479-480 (2010).

3. *Defense counsel's failure to request jury instructions on voluntary or involuntary manslaughter.* The defendant argues that his attorney was ineffective in failing to request jury instructions on voluntary or involuntary manslaughter, and that the absence of such instructions produced a substantial likelihood of a miscarriage of justice.

At a charge conference toward the end of the prosecution's case, defense counsel asked the judge not to provide the jury with a manslaughter instruction and told the judge that he did not intend to argue that the defendant acted either in self-defense or in defense of another. At the request of both the prosecutor and defense counsel, the judge at the final charge conference conducted a colloquy with the defendant in which the defendant informed the judge that he had discussed the matter with his attorney, understood the difference in penalties between a conviction of manslaughter and murder, and did not want the jury to be given a manslaughter instruction. The judge declared that he would not give a manslaughter instruction because the defendant did not want the instruction, and because there was no factual basis for a manslaughter charge.

"We examine the defendant's claim of ineffective assistance of counsel under G. L. c. 278, § 33E, which is more favorable to a defendant than the Federal or State constitutional standards." *Commonwealth* v. *Mosher*, 455 Mass. 811, 827 (2010). Where, as here, the defendant did not move for a new trial and supplement the record with an affidavit of his trial attorney explaining why he did not want the jury to be given a manslaughter instruction, we review the trial record alone to determine whether a defense counsel's strategic or tactical decision questioned on appeal was manifestly unreasonable when made and, if so, whether the unreasonable decision resulted in a substantial likelihood of a miscarriage of justice. *Id. Commonwealth* v. *Boateng*, 438 Mass. 498, 509 (2003). "We keep in mind that an ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight." *Commonwealth* v. *Norris*, *ante* 131, 142 (2012), quoting *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002).

We give trial counsel's strategic and tactical decisions due deference, recognizing that "[m]any decisions of defense counsel that are characterized in hindsight as errors may have been reasonable tactical or strategic decisions when made." *Commonwealth* v. *Mosher, supra.* See *Commonwealth* v. *Norris, supra* at 141-142, quoting *Commonwealth* v. *Smith,* 459 Mass. 538, 554 (2011) ("to determine whether the failure to request an instruction on defense of another was error, we must consider whether counsel's apparent decision not to request the instruction was 'so manifestly unreasonable as to be unprotected by the labels of "trial strategy" or "trial tactics" ' "); *Commonwealth* v. *Boateng, supra.*

The only evidence that arguably could support a voluntary manslaughter instruction was Veronica Copeland's testimony that the defendant told her he acted in self-defense, a self-serving assertion that was wholly unsupported by the evidence. The only evidence that arguably could support an involuntary manslaughter instruction was Naeemah Mitchell's testimony that the shooter did not appear to be aiming at any particular person. But even Naeemah testified that the shooter fired three times "[t]owards [the victim], towards the fight," and the overwhelming weight of the evidence was that many people were congregated in or around the fistfight. We conclude that it was not manifestly unreasonable for defense counsel, with the informed consent of the defendant, to decide to focus the jury on the defense of mistaken identity and avoid diluting that defense with a suggestion that the defendant used excessive force in self-defense or recklessly fired the shots with no intent to kill or grievously injure. See *Commonwealth* v. *Norris, supra* at 141-144. We also conclude that no substantial likelihood of a miscarriage of justice arose from the absence of a voluntary or involuntary manslaughter instruction, because there is no significant risk that a reasonable jury would have reached such a verdict had they been given this option.[8] In view of this conclusion, we need not reach the ques-

---

[8]With respect to the absence of an involuntary manslaughter instruction, we note that the jury were given the option of finding the defendant guilty of murder in the second degree if they had a reasonable doubt whether the defendant acted with premeditation or intended to kill, but found the defendant guilty of murder in the first degree. Cf. *Commonwealth* v. *Tolan,* 453

tion whether the evidence was sufficient as a matter of law to support a voluntary or involuntary manslaughter instruction.

4. *The judge's criticism of defense counsel's conduct at trial.* The defendant claims that the judge, sua sponte, unfairly "interjected himself into defense counsel's efforts" at various times during the trial and gave the jury the impression that he "disfavored defense counsel and, inferentially, the position that defense counsel represented," which created a substantial likelihood of a miscarriage of justice. The defendant points to four instances.

First, during the defendant's opening statement, defense counsel stated: "You're going to hear from other witnesses, and as [the prosecutor] is trying to suggest to you, on the fly. For the record, they'll testify about what they saw, but you know, we've got Raquel, we've got Ariel, we've got Anita, and we've got Naeemah." The judge interrupted the opening statement and admonished defense counsel in front of the jury: "This is not argument, please. Tell the jury what witnesses you're going to put on, or what the evidence is going to be, but no argument, please."

Second, after Sergeant Detective Randall J. Halstead of the crime scene response unit testified to his examination of the crime scene, defense counsel on cross-examination asked him whether employees at the Boston crime laboratory are capable of conducting a paraffin test to locate gunpowder residue. The judge called counsel to sidebar and noted that the witness had already testified that he did not know whether the crime laboratory was responsible for conducting paraffin tests, but he ultimately allowed defense counsel to ask the question.[9]

Third, defense counsel, while discussing Naeemah's trial testimony in closing argument, stated: "And during that time, she doesn't see a gun, but she sees him [Webb] motioning toward his waistband as if he had a gun. We all know he did. Anita told us he did." The judge interrupted: "Counsel, don't make any

Mass. 634, 650 (2009) ("The jury rejected the option of murder in the second degree, the malice element of which comes closest to involuntary manslaughter").

[9]Sergeant Detective Halstead then testified that he did not know whether the crime laboratory conducted those tests.

statements about anybody. This is not a time to be giving your opinions about anything. You say, 'We all know.' . . . [P]lease don't do that."

Fourth, later in the closing argument, the judge informed counsel that he had "approximately eleven minutes to go." The judge did not provide a comparable warning to the prosecutor during his closing argument even though, measured in transcript pages, the prosecutor's closing argument was approximately seven pages longer.[10]

"[A] judge need take no vow of silence. He is there to see that justice is done, or at least to see that the jury have a fair chance to do justice. . . . The judge ought not to let the jury be diverted from the real issue. The skill of counsel must not be allowed to mislead the jury by raising false issues or by appeals to emotion and prejudice. . . . It is not always easy for a judge to see his duty clearly. But a first-rate trial judge will find and tread the narrow path that lies between meddlesomeness on the one hand and ineffectiveness and impotence on the other." *Commonwealth* v. *Haley*, 363 Mass. 513, 519 (1973), quoting Lummus, The Trial Judge 19-21 (1937). In treading that "narrow path," "[t]rial judges should refrain as far as reasonably possible from making critical comments before the jury," *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 847 (1980), because "any judicial comment is likely to be accorded substantial weight by the jury." *Commonwealth* v. *Sneed*, 376 Mass. 867, 870 (1978), and cases cited.

The defense counsel's assertion in his opening statement, anticipating what the prosecutor would argue in closing argument regarding the testimony of key eyewitnesses, was inappropriate in an opening statement. See *Commonwealth* v. *Staines*, 441 Mass. 521, 535 (2004), quoting *Commonwealth* v. *Croken*, 432 Mass. 266, 268 (2000) ("proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence").

---

[10]Defense counsel objected only to the judge's interruption of his closing argument to warn him of the time remaining. "While we understand the natural reluctance of trial counsel to object to questions or comments coming from a judge, sometimes trial counsel's duty to protect his client's rights requires him to object, preferably at the bench out of the jury's hearing." *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846 (1980).

And defense counsel's assertion in closing argument that "[w]e all know" that Webb had a gun at the cookout because "Anita told us he did" borders on inappropriate vouching for a witness. See *Commonwealth* v. *Burgos, ante* 53, 72 n.24 (2012), quoting *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989) (vouching can occur if attorney "expresses a personal belief in the credibility of a witness . . . or . . . indicates that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility"). Therefore, the judge did not err in admonishing the defendant for improper argument. Nor was it improper for the judge to call defense counsel to sidebar when he asked a question of Sergeant Detective Halstead that the witness had essentially just answered, especially where the judge allowed the question later to be asked. And we cannot conclude that the judge acted unfairly in warning defense counsel, but not the prosecutor, as to how much time he had left in his closing argument, because the record does not reflect the duration of their respective closing arguments apart from the number of transcript pages, which is a poor measure of elapsed time.[11]

Based on our review of the trial transcript under G. L. c. 278, § 33E, we note that the judge, who was generally courteous and patient during the trial, occasionally lost his patience with defense counsel and admonished him, generally at sidebar, but

---

[11]Defense counsel appeared to believe that no firm time limit had been imposed on his closing argument by the judge. The previous day, in discussing the length of closing arguments, defense counsel had asked for one hour, and the judge replied:

> "My attitude is that this case is such an important case, that this case has been . . . tried so well by both counsel in this case, that I am one who is not particularly tough on that kind of issue, that if counsel thinks that amount of time is necessary to present its case to the jury, they generally should have it in a case like this."

This may have suggested to defense counsel that a time limit would not be strictly enforced, but it more plausibly suggests that the judge would grant whatever reasonable time limit defense counsel might request, especially where defense counsel then advised the judge that his closing argument "might still be an hour," and the judge replied, "That's all right." We urge judges who intend to enforce a time limit to make clear to counsel before closing argument the limit to be imposed and the possibility that the judge will warn them of the time remaining.

at times in front of the jury.[12] We conclude that the judge's critical comments did not create a substantial likelihood of a miscarriage of justice. The judge in his final instructions to the jury told them to disregard anything he said that could suggest he had any opinion concerning the facts in the case.[13] More important, the evidence of the defendant's guilt was so overwhelming that there is no significant likelihood that the jury's verdicts were in any way affected by the judge's occasional lapse of patience with defense counsel.

5. *The defendant's* Moffett *brief.* The defendant, in what he characterizes as a brief filed pursuant to *Commonwealth* v. *Moffett*, 383 Mass. 201 (1981), claims that the judge erred in his final instructions regarding proof beyond a reasonable doubt, murder in the second degree, circumstantial evidence, and identification. We discern no error in these instructions.[14]

6. *Review under G. L. c. 278, § 33E.* Apart from the arguments presented in the briefs, we address one issue that emerges

---

[12]We provide two examples. First, the judge told defense counsel at sidebar, "I noticed during some of the examination that you smile a lot when questions are asked," and said he should "[t]ry and watch that," because "[t]his is not Hollywood . . . ." Second, after Anita testified to a dispute Webb had at the cookout with the grill chef over the cooking of his hamburger before Webb's fight with Ariel, and said that she did not remember whether Webb made the scene "a little bigger," defense counsel continued: "That's fair. That's done, that's over with. Everyone still kind of hangs out in the back yard?" After Anita answered, "Yes," the judge interjected in front of the jury: "Counsel, those questions are not appropriate because you're making a statement, then you ask a question. Ask the questions, okay?"

[13]The judge told the jury:

"If I have said or done anything to cause you to believe that I have any opinion concerning the facts in this case then you are mistaken because I am totally neutral on this issue. You are not to consider the tone or inflection of my voice in reaching a verdict. You should not listen to any of my voice inflections as any indication of what my thoughts are as to any possible verdict. I have no such thoughts. If you believe you detected any facial expressions of mine that might indicate I have an opinion concerning the facts of this case or what your verdict ought to be or should be, you are to please disregard it. I am totally neutral on this issue."

[14]Because we find no error, we need not address the Commonwealth's contention that our decision in *Commonwealth* v. *Moffett*, 383 Mass. 201, 208, 216-217 (1981), was not intended to permit "hybrid representation," and that we should not consider these claims of error.

from our plenary review of the trial transcript under G. L. c. 278, § 33E. In his opening statement, defense counsel concluded with the following cryptic statement:

> "The prosecutor has just stood before you and indicated that all this evidence, that you will find him guilty of murder, guilty of possession of that firearm, possession of ammunition. . . . You think what I'm about to say is you're going to find him not guilty after you hear all the evidence. I'm not going to say that. He might be having a mild heart attack on me right now but I'm not going to say that. . . . Later you'll know why I stand here before you now and say that. I look forward to addressing you in my closing."

In his closing argument, however, defense counsel told the jury that the "true verdict" in this case was not guilty. He made no reference to his cryptic remarks in his opening statement and did not explain what he meant by them. Nor can we discern what he meant from the record because his strategy at trial appeared to focus primarily on mistaken identification, and he did not seek any instructions regarding a lesser included offense. While we are unable to infer from the record any sound reason in this case why defense counsel would tell the jury that he would not ask them to find the defendant not guilty, we conclude that these remarks did not create a substantial likelihood of a miscarriage of justice because they were made in opening statement, not closing argument, and because the evidence of the defendant's guilt was overwhelming.

*Conclusion.* None of the defendant's claims on appeal warrants reversal of the convictions. We also have reviewed the entire trial record pursuant to G. L. c. 278, § 33E, and conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt or a new trial.

*Judgments affirmed.*