NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11525


COMMONWEALTH  vs.  VERNON T. CARTER.



Plymouth.     April 8, 2016. - September 19, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.[1]


Homicide.  Robbery.  Firearms.  Felony-Murder Rule.  Assault and
    Battery.  Joint Enterprise.  Identification.  Evidence,
    Identification, Joint venturer.  Intoxication.
    Constitutional Law, Right to bear arms.  Practice,
    Criminal, Capital case, Duplicative convictions, Witness,
    Assistance of counsel, Argument by prosecutor, Instructions
    to jury, Conduct of judge.



    Indictments found and returned in the Superior Court
Department on December 30, 2009.

    A pretrial motion to suppress evidence was heard by Thomas
F. McGuire, Jr., J., and the cases were tried before Raymond P.
Veary, Jr., J.


    Russell C. Sobelman for the defendant.
    Gail M. McKenna, Assistant District Attorney, for the
Commonwealth.


---

    [1] Justices Spina and Duffly participated in the deliberation
on this case prior to their retirements.

HINES, J.  In April, 2013, a jury convicted the defendant, Vernon T. Carter, of murder in the first degree of Scott Monteiro on a theory of felony-murder, based on the predicate felony of armed robbery.[2]  The defendant was also convicted of armed robbery, assault and battery of Sheldon Santos, possession of a firearm, and possession of ammunition.[3]  On appeal, the defendant asserts error in (1) admission of identifications obtained through procedures alleged to be suggestive; (2) testimony from a last-minute Commonwealth witness; (3) the prosecutor's closing argument; (4) omission of jury instructions regarding involuntary manslaughter, "humane practice," and intoxication; (5) judicial bias; and (6) firearms-related convictions without evidence that he was not licensed.[4]  The

---

[2] The jury did not find the defendant guilty on the theory of deliberate premeditation.

[3] The defendant was sentenced to life imprisonment in the State prison without parole on the murder conviction; to from nine to twelve years on the armed robbery conviction, to be served from and after the murder sentence; and to from three to five years on the firearm conviction, to be served from and after the armed robbery sentence.  He was also sentenced to a house of correction for two years for unlawfully possessing ammunition and for two and one-half years for assault and battery, to run concurrently with the murder sentence.

[4] The defendant also claims that trial counsel provided constitutionally ineffective assistance.  Because his claim of ineffective assistance is based on counsel's failure to act appropriately to prevent some of the errors claimed on appeal or to preserve the defendant's rights regarding those alleged

defendant also argues that he is entitled to relief under G. L. c. 278, § 33E. We vacate, as duplicative, the defendant's armed robbery conviction, because it was the predicate felony for his felony-murder conviction, the only theory on which the jury found him guilty of murder in the first degree. See Commonwealth v. Alcequiecz, 465 Mass. 557, 558 (2013). We affirm the defendant's remaining convictions, and we discern no other basis to exercise our authority pursuant to G. L. c. 278, § 33E.

Background. We summarize the evidence as the jury could have found it, reserving certain facts for later discussion. At approximately 10 P.M. on Friday, September 4, 2009, a group of twenty to thirty people, in their late teens or early twenties and generally from the Wareham area, gathered at a residence in Wareham for a "house party." People were socializing and drinking, "[j]ust teenage and adolescent kids having fun." Monteiro, who had turned twenty-one years of age approximately one month before the party, arrived with three of his friends. Santos was there wearing a gold chain.

One of the young women at the party had asked the host if she could invite her friend "Justin." Between 11:30 P.M. and midnight, Justin arrived with a group of ten to fifteen people.

_____

errors, we shall address this claim when we address the other claims.

They introduced themselves to one or more partygoers as being from the "United Front" in New Bedford. The party became more "tense" after the group's arrival, and someone in the group started to complain, "This party is whacked. . . . There's no bitches." A short time later, the majority of the New Bedford group left the house. Within a few minutes, two to five people reentered and approached Santos. Santos had been sitting on a sofa with his girl friend, and Monteiro was sitting on a nearby chair. Santos stood up when approached, and a few people from the New Bedford group surrounded the sofa area so as to prevent anyone from leaving. The defendant pulled a gun out of his pants, pointed it at Santos's head, and said, "Run your chain." He reached toward Santos, and Santos dropped to the floor. Monteiro then stood up, held his hands out with palms facing up, and calmly said, "Chill, we are all just chilling." The defendant fired three shots, and a single bullet hit Monteiro above his right eye. At some point during this altercation, Santos suffered a face injury that required sutures; he also lost his gold chain.

One of Monteiro's friends attended to him as the remaining partygoers dispersed. The police and emergency medical services personnel arrived a few minutes after the shooting. Monteiro was lying on the floor, breathing but unresponsive. He was

transported by ambulance to a nearby hospital. Monteiro died from a gunshot wound to the head.

The police recovered a spent shell casing from the ambulance and, during Monteiro's autopsy, recovered three fragments of a shell casing from Monteiro's head. The shell casing from the ambulance was from a .22 caliber firearm, and the fragments were consistent with being from the same firearm.

The police spoke to witnesses the night of the party, many of whom gathered outside of the house after the incident. At least one of the partygoers knew the defendant by name and provided that information to police.[5] Using that information, Wareham police compiled two photographic arrays containing the defendant's photograph. The following morning, the police showed the first array containing eight photographs to the witness who knew the defendant. The witness did not identify the defendant's photograph in this array. Less than one hour later, the police showed the witness the second array containing six photographs. The witness identified the defendant in the second array, explaining that he recognized the defendant in the first array but did not identify him because he was "nervous."

Approximately one and one-half hours after the identification, Wareham police notified police in New Bedford

---

[5] This witness had seen the defendant approximately five times during the prior three years.

that the defendant was a suspect in a homicide investigation and requested that they question him.  Within one hour of the dispatch, New Bedford police officers observed the defendant walking and stopped their cruiser to speak to him.  The defendant stopped and agreed to accompany them to the police station for questioning.  At the police station, the officers recorded the interview.  The defendant told them that he had been at the party but stayed outside the house.  After questioning the defendant for approximately one hour, the police released him.

The following morning, the defendant went to the house of a woman he had known since he was a child and asked if he could stay with her because the police were looking for him in connection with an incident at a party in Wareham.  She said, "no," because her family was there.  As she hugged him goodbye, she felt something "heavy" and "hard" in the defendant's waist.

State police arrested the defendant later that day pursuant to a warrant.  He was wearing a black hat displaying the word "Invincible."  The State police interrogated the defendant on September 6 and 7, 2009.[6]  The defendant told police that he was at the party, he did not have a gun, but he knew that at least

---

[6] In total, police interviewed the defendant four times between September 5 and 7, 2009.  All four interviews were recorded.  Redacted versions of the first three recordings were played for the jury.

four people in his group were carrying firearms. He said that Santos and his "squad" had guns and threatened someone in the New Bedford group. He said he saw the shooter "cock" the firearm and "pistol whip" Santos, and that he was about five or six feet from the shooter when the gun was fired. The defendant also told police that one of the people in his group, "Justin," hid a gun after the party, and he directed police to the apartment where the gun could be found. The police seized a .38 caliber firearm from the apartment, which did not fire the shell casing obtained from the ambulance and was not consistent with the firearm used as the murder weapon.[7]

Within forty-eight hours of the shooting, four witnesses identified the defendant as the shooter in photographic arrays.[8,9] They and other witnesses described the shooter as

---

[7] A man who lived in the apartment testified that the defendant had asked him to hide the firearm "one or two days" before the search on September 7, 2009, and a woman, the man's wife, testified that the defendant's visit occurred before the date of the party.

[8] Sheldon Santos testified that the defendant was at the party, but "nothing happened" between them. A State police trooper testified that Santos had previously pointed to the defendant in a photographic array and said, "he was in the house acting cool, then he went outside, then he came back in. I think I might have been fighting him." Santos, however, became uncooperative after police asked him to circle the defendant on the array for identification, and he refused to speak further with the police.

between five feet, five inches and five feet, nine inches tall, skinny, "light skinned," and wearing a black hat. One of the witnesses testified that the shooter was wearing a hat displaying the word "Invincible." The police showed the witnesses an additional photographic array containing other people mentioned by the defendant as being at the party. Except for one witness who identified a photograph of Justin as being at the party, no other potential suspects were identified.

Discussion. The defendant challenges a number of issues at trial, framing them as errors by the judge, the prosecutor, defense counsel, or some combination thereof. We consider each claim to determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

1. Identification evidence. The defendant filed a motion to suppress the four eyewitness identifications of him as the shooter, claiming that the photographic arrays were unnecessarily suggestive and tainted the remaining identifications because the witnesses discussed the incident in

---

[9] One witness identified a photograph as someone who was at the party, but the identified photograph depicted someone who was incarcerated at the time of the party.

person and through social media.  Two witnesses failed to identify the defendant in an initial photographic array containing eight photographs, but subsequently identified the defendant when shown the second array containing six photographs.  The defendant was the only person depicted in both arrays.  The defendant also argued that the following procedures caused the arrays to be unduly suggestive:  the photographs were not presented sequentially, the arrays were not blindly administered, and all arrays should have contained at least eight photographs.

At the evidentiary hearing, the defendant focused on the two identifications that were obtained through repetitive arrays.  The judge concluded that the repeat arrays were not unnecessarily suggestive.  First, the photographs in each array were similar to the defendant's photographs.  Next, the second array contained a more recent photograph of the defendant with shorter hair, which was more similar to his appearance at the party, and both witnesses told police that the shooter had shorter hair than the individuals depicted in the photographs in the first array.  Moreover, the judge found that the witness who knew the defendant before the party was not swayed by the presence of his photograph in repeat arrays, crediting the witness's testimony that he did not identify the defendant in the first array out of fear.

On appeal, the defendant does not claim error in the denial of the motion to suppress, but argues that the prejudicial effect of the photographic array procedure; the conflicting witness testimony; the consumption of alcohol and marijuana by eyewitnesses; and a "rumor mill"[10] created through witness discussion of the incident prior to the identifications, social media, and media coverage caused a substantial likelihood of a miscarriage of justice.  The defendant's argument lacks merit.

The defendant "has a due process right to identification procedures meeting a certain basic standard of fairness." Commonwealth v. Silva-Santiago, 453 Mass. 782, 794 (2009), quoting Commonwealth v. Dougan, 377 Mass. 303, 316 (1979).  We discourage the use of repeated arrays containing a suspect's photograph, see Commonwealth v. Scott, 408 Mass. 811, 826 (1990), and the use of repeated arrays could make identification procedures unnecessarily suggestive if the police do not have good cause for the use of such procedure.  In this case, the judge implicitly found good cause because the second array was given to both eyewitnesses after each commented that the

---

[10] The partygoers gathered outside of the house after the shooting for fifteen to twenty minutes without being separated and discussed the incident through social media and other interactions before being individually questioned by police. The defendant claims that these conditions created a "rumor mill" that caused the identifications to be based on speculation.

perpetrator's hair was shorter than was depicted in the photographs used in the first array. Moreover, we recognize that police did not follow procedures that we have previously recommended: "double-blind procedure" and "sequential method." See Silva-Santiago, supra at 797-800. However, the absence of the recommended procedures goes only to the weight of the identifications, not admissibility.[11] Id. at 797-799.

Our conclusion that the identifications were not "unnecessarily suggestive" does not end the inquiry. Even if otherwise admissible, a judge may suppress identification evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Commonwealth v. Johnson, 473 Mass. 594, 599 (2016), quoting Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014). Mass. G. Evid. § 403 (2016). In

---

[11] We also note that a State police trooper administering each of the repeat arrays to one witness told the witness during her first array, after she failed to make an identification, "just to think about it and it's important if she did see somebody in there that, you know, she does the right thing, as we would expect other people to do so." Before each of the two arrays shown to this witness, the trooper properly notified her that the alleged wrongdoer may or may not be in the photographs depicted in the array, as required by Commonwealth v. Silva-Santiago, 453 Mass. 782, 798 (2009). This comment, however, detracted from the substance of that notification. Where the officer properly followed the notification protocol expressed in Silva-Santiago, we do not conclude that the officer's statement caused the identification that the witness made during the second array to be inadmissible. We, again, strongly recommend that photographic arrays be performed by law enforcement officers who do not know the identity of the suspect in order to protect against similar statements being inadvertently made.

this analysis, the "probative value of the identification depends on the strength of its source independent of the suggestive circumstances of the identification."  Johnson, supra at 601.  Relevant factors include "the witness's opportunity to observe the offender at the time of the crime, the amount of time between the crime and the identification, whether the witness's earlier description of the perpetrator matches the defendant, . . . whether the witness earlier identified another person as the perpetrator or failed to identify the defendant as the perpetrator," and "the witness's prior familiarity with the person identified."  Id.

The record reflects, however, that the defendant would not have been able to meet his burden to establish that the prejudice resulting from the admission of the identifications outweighed their probative value.[12]  The four eyewitness identifications were made within forty-eight hours of the shooting, the witnesses observed the shooter from nearby locations -- one witness being "a foot away" from the gunman at the time -- and their ability to observe and report the incident was not impaired by alcohol or drugs.

_____

[12] A "defendant must timely file [such a] motion before trial, . . . and bears the burden of proof by a preponderance of the evidence" (citation omitted).  Commonwealth v. Johnson, 473 Mass. 594, 599 (2016).  The defendant did not file such a motion, but we consider this argument under G. L. c. 278, § 33E.

2.  Last-minute witness.  The defendant claims that he was unfairly surprised by the testimony of a witness not listed on the pretrial witness list and that trial counsel was ineffective for failing to object to this testimony.  The Commonwealth has an affirmative duty to timely disclose proposed witnesses.  See Mass. R. Crim. P. 14 (a) (1) (A) (iv), (v), as amended, 444 Mass. 1501 (2005).  A judge has "significant discretion in deciding whether late-discovered or late-disclosed witnesses should be excluded from testifying" as a remedy for the late disclosure.  Commonwealth v. Nolin, 448 Mass. 207, 225 (2007), quoting Commonwealth v. Trapp, 423 Mass. 356, 363-364, cert. denied, 519 U.S. 1045 (1996).  The relevant inquiry is whether the defendant has sufficient time to investigate the proposed testimony.  Commonwealth v. Lopez, 433 Mass. 406, 413 (2001). In that regard, "it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence." See Commonwealth v. Baldwin, 385 Mass. 165, 175 (1982), quoting Commonwealth v. Wilson, 381 Mass. 90, 114 (1980).

Here, the prosecutor told the judge on the fifth day of trial that he had mistakenly omitted a witness from the list. He asked that the witness, a Wareham police officer, be permitted to testify and asserted that defense counsel had agreed to such the prior day.  The judge granted the request. The officer, who was the first at the scene of the shooting,

testified that he saw a shell casing from a small caliber firearm on the floor near Monteiro's body when he approached to provide care. Police did not find that shell casing or any other ballistics evidence at the house.

The defendant has not shown any prejudice from the testimony or demonstrated that he could have benefited if defense counsel had objected. The record reflects that defense counsel agreed to the prosecutor's request, suggesting that he had an adequate opportunity to prepare for the testimony. Moreover, he thoroughly cross-examined the witness on matters relating to the central issue in the trial -- the credibility of the eyewitness identifications. The officer testified after the five eyewitnesses, all of whom had been shown photographic arrays. Defense counsel's cross-examination focused on differences between recommended procedures for arrays and those used during this investigation. Defense counsel may have strategically decided not to object to this witness so that he could challenge the identification techniques at this stage of trial.[13]

---

[13] The defendant raised this and other claims of ineffective assistance of counsel for the first time on appeal, leaving us to consider the issues based only on the trial record. Relief on a claim of ineffective assistance based on the trial record is the weakest form of such a claim because it is "bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with

3.  Prosecutor's closing argument.  The defendant

challenges the following two portions of the prosecutor's

closing argument:

> "In counsel's closing, experienced and skilled
> counsel, . . . he hit on a number of points.  The problem
> is with his arguments regarding for example social media.
> You heard a lot of questions about it.  There's one problem
> with that argument.  There was no testimony to back up the
> fact that anyone was influenced in their identification by
> social media, by popular media, TV, newspaper.
>
> ". . .
>
> "Did you see anything in these young people . . . that
> would convince you that they would come in here and as the
> argument was made hold someone accountable; that was the
> name that they knew so they want to say that.  They want
> someone to be held accountable for this and so they just
> went with this, this guy over there.  I'll say it was him.
> Do you believe that they would come in and do that?  Did
> you hear anything about those individuals, did you see
> anything in them as you sized them up that would convince
> you that they would come in and do that because someone's
> got to pay.  It might as well be that guy over there.  It's
> ridiculous.  There's no reason to believe that and you
> shouldn't believe that."

"Remarks made during closing arguments are considered in context

of the whole argument, the evidence admitted at trial, and the

judge's instructions to the jury."  Commonwealth v. Andrade, 468

---

hindsight."  Commonwealth v. Gorham, 472 Mass. 112, 116 n.4
(2015), quoting Commonwealth v. Peloquin, 437 Mass. 204, 210 n.5
(2002).  "[T]he factual basis of the claim [must] appear[]
indisputably on the trial record."  Commonwealth v. Zinser, 446
Mass. 807, 811 (2006), quoting Commonwealth v. Adamides, 37
Mass. App. Ct. 339, 344 (1994).  The defendant's claim here does
not appear indisputably on the trial record where defense
counsel's lack of objection may have been a strategic decision.

Mass. 543, 552 (2014), quoting Commonwealth v. Whitman, 453 Mass. 331, 343 (2009).

Specifically, the defendant argues that the prosecutor's statement regarding social media was not a fair inference from the evidence. See Commonwealth v. Guy, 441 Mass. 96, 110 (2004), citing Commonwealth v. Stote, 433 Mass. 19, 28 (2000) ("Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom"). We disagree. Although there was evidence that the partygoers discussed the shooting, the eyewitnesses testified that they were not influenced by outside sources in making their identifications. Moreover, the only witness who testified that she had used social media in an attempt to "look[] for anybody else that [she] may have seen at the party" identified an individual who was incarcerated at the time, not the defendant.

The defendant also argues that the prosecutor's discussion of the eyewitness testimony improperly vouched for credibility. "While a prosecutor may not vouch for the truthfulness of a witness's testimony, . . . we consistently have held that, where the credibility of a witness is an issue, counsel may 'argue from the evidence why a witness should be believed'" (citations omitted). Commonwealth v. Brewer, 472 Mass. 307, 315 (2015). During the defendant's closing, counsel challenged the credibility of the first identifying witness when he argued that

the "police [were] signaling to [him] . . . who they want him to pick up, and there's no love lost at this point between [that witness] and anybody from New Bedford who was at that party this evening."  The prosecutor properly responded by arguing that the jury could reject that suggestion by recalling the characteristics of the witnesses' testimony.

Because the prosecutor's statements were not improper, trial counsel was not ineffective for failing to object.  Even if there had been an appearance of impropriety in the statements, the judge carefully and clearly instructed the jury that closing arguments are not evidence and that they alone were tasked with determining credibility.  These instructions offset any prejudice.[14]  See Brewer, supra.

4.  Jury instructions.  The defendant challenges the omission of three jury instructions:  (a) involuntary manslaughter; (b) humane practice; and (c) intoxication.  He argues that these omissions created a substantial likelihood of a miscarriage of justice and that trial counsel was ineffective for failing to object.

---

[14] Because the defendant did not object, we would review any errors to determine whether they created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Cassidy, 470 Mass. 201, 225-226 (2014), citing Commonwealth v. Francis, 450 Mass. 132, 140 (2007).

a.    Involuntary manslaughter.  As here, "where a defendant is charged with murder, an instruction on involuntary manslaughter is appropriate if any 'reasonable view of the evidence would [permit] the jury to find 'wanton [or] reckless' conduct rather than actions from which a 'plain and strong likelihood' of death would follow.'"  Commonwealth v. Tavares, 471 Mass. 430, 438 (2015).  After the last witness testified, but before the Commonwealth rested, the judge advised the parties that the evidence so far did not warrant an instruction on "either species of manslaughter."  Trial counsel said that he "would ask for [a manslaughter instruction]," but that he was "not going to argue" with that ruling.

The judge did not err in concluding that the evidence did not support such an instruction.  In Commonwealth v. Braley, 449 Mass. 316 (2007), we concluded that "intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death."  Id. at 332, quoting Commonwealth v. Mack, 423 Mass. 288, 290 (1996).  Here, witnesses testified that the defendant pointed a gun at Santos's head, the gun made a sound as if it was being cocked, the defendant fired three shots in quick succession, and Monteiro was shot from a distance of no more than two feet.  Because a manslaughter instruction was not warranted, trial counsel was not ineffective for failing to object.

In any event, the jury convicted the defendant of felony-murder, but they did not find him guilty of deliberate premeditation.  "Where the felony-murder rule applies, generally the defendant is not entitled to an instruction on manslaughter."  Commonwealth v. Evans, 390 Mass. 144, 151 (1983), citing Commonwealth v. LePage, 352 Mass. 403, 419 (1967).  Because the killing occurred during the commission or attempted commission of an armed robbery, the instruction was not warranted.  See Commonwealth v. Neves, 474 Mass. 355, 370-371 (2016).

b.  Humane practice.  A "humane practice" instruction is required where a defendant's statements are offered in evidence and the voluntariness of those statements is "a live issue at trial."  Commonwealth v. Tavares, 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982), quoting Commonwealth v. Alicea, 376 Mass. 506, 523 (1978).  The defendant argues that the judge erred in failing to give a humane practice instruction and trial counsel was ineffective for failing to request it because evidence suggested that the defendant had been intoxicated and consumed marijuana the night of the party and that he had a "terrible headache" and was "emotionally upset" during the interview the following day.

Counsel did not challenge the voluntariness of any statements through pretrial motions or at trial on these

grounds.[15] Additionally, counsel specifically declined to have a humane practice instruction read to the jury. The defendant's theory at trial was mistaken identity -- that he was at the party but not involved in the altercation. The statements that the defendant gave to police align with that theory and, where the defendant did not testify, produced the only evidence in support of his claim. It "would be anomalous to require the judge to inquire into the issue 'where it might be contrary to the theory and strategy of the defendant.'" Commonwealth v. Benoit, 410 Mass. 506, 513 (1991), quoting Commonwealth v. Pratt, 360 Mass. 708, 714 (1972). There was no error.

c. Intoxication. "A jury instruction on voluntary intoxication is required only where there is evidence of 'debilitating intoxication' that could support a reasonable doubt as to the defendant's ability to form the requisite criminal intent." Commonwealth v. Lennon, 463 Mass. 520, 523 (2012). The defendant argues that the judge erred in failing to give an intoxication instruction and trial counsel was

---

[15] Trial counsel challenged the admission of the first interview conducted by the New Bedford police, arguing that the defendant was illegally stopped and seized prior to the interview, that the statement was not voluntary because the police impermissibly gave him the impression that he could only leave if he cooperated, that the police used trickery, and that the interview was recorded without the defendant's consent. The judge denied the defendant's motion to suppress. During pretrial motions and at trial, the defendant only challenged specific portions of the interviews.

ineffective for failing to request it because there was evidence supporting the defendant's intoxication.[16]

There was no evidence that the defendant's condition at the time of the shooting approached the level of "debilitating intoxication" required for the instruction. Lennon, supra. One witness testified that people in the group from New Bedford were drinking liquor, but she did not remember everyone in the group drinking. Although the defendant told police during the interrogation that he was "drunk out of [his] mind" and "high" at the party, these self-serving statements are insufficient to warrant an intoxication instruction where there was nothing to support the inference that intoxication impaired the defendant's ability to form the requisite criminal intent at the time of the altercation. Commonwealth v. Moses, 436 Mass. 598, 603 (2002). Cf. Commonwealth v. Gonzalez, 469 Mass. 410, 412-413, 422 (2014) (error to omit intoxication instruction where evidence showed defendant had spent evening drinking, was intoxicated two hours before murder, and had "'red, glassy eyes' and smelled of alcohol" when police arrived shortly after murder).

---

[16] The judge asked the defendant if he would be requesting an intoxication or manslaughter instruction, and counsel responded that he "believe[d]" he would be asking for a manslaughter instruction. He did not request an intoxication instruction.

5. _Judicial bias_. The defendant argues that the judge prejudiced his case by demonstrating partiality toward the Commonwealth. Specifically, the defendant claims that the judge engaged in the following conduct suggestive of such a bias: (a) allowing the prosecutors to ask leading questions of their witnesses; (b) allowing the prosecutor to introduce statements during trial after asserting pretrial that he did not intend to admit them; (c) asking questions of a witness; (d) instructing the jury that their memory controlled after counsel conducted what the defendant describes as a "very effective cross-examination" regarding prior testimony;[17] and (e) assisting the prosecutor to introduce evidence against the defendant.

"The role of the trial judge is that of an impartial arbiter and not that of a prosecutor." Commonwealth v. Sneed, 376 Mass. 867, 870 (1978). A judge "is there to see that justice is done, or at least to see that the jury have a fair chance to do justice . . . a first-rate trial judge will find and tread the narrow path that lies between meddlesomeness on

---

[17] The judge instructed the jury as follows:

> "Jurors, I think it is perhaps an appropriate time, because both sides have referred to what may have been said by a witness while on this stand, and perhaps other witnesses as well, I am not going to comment upon the testimony of any witness in this case, but I do want you to remember something that I told you right at the outset. It is your memory of the testimony, your memory of the evidence, that controls this case. No one else's."

the one hand and ineffectiveness and impotence on the other."
Commonwealth v. Brown, 462 Mass. 620, 632 (2012), quoting
Commonwealth v. Haley, 363 Mass. 513, 519 (1973).  Here, the
judge performed commendably during this lengthy trial.

The judge sustained defense objections to leading questions
by the prosecutor, and the defendant did not object to other
leading questions that are now challenged.  Sua sponte, the
judge alerted the prosecutor to his leading questions before the
defendant objected.  These actions conform with the judge's task
to "see that justice is done."  Brown, 462 Mass. at 632.

Although the judge allowed the Commonwealth to play three
of the defendant's four recorded statements during trial when it
originally intended to play only the first recording, the
defendant was aware of the remaining recordings and had
submitted his proposed redactions to the judge before trial.
The judge resolved any issues with redactions in favor of the
defendant for the remaining recordings when he ruled that the
Commonwealth would not be allowed to play those interviews
unless the prosecutor obtained the defendant's agreement
regarding redactions.

The judge did not err in questioning a witness.[18]  A judge may properly question a witness, even where to do so may "reinforce the Commonwealth's case, so long as the examination is not partisan in nature, biased, or a display of belief in the defendant's guilt."  Commonwealth v. Festa, 369 Mass. 419, 422 (1976), and cases cited.  Although defense counsel requested that the judge refrain from any further questioning, he stated that he did not "have a problem with that question[ing]," and that he "was just raising [his] concerns."  We discern no error where the defendant has failed to establish that the judge's questions were inappropriate on any of these grounds.

Additionally, the judge did not err in instructing the jury that their memory controls.  This is a proper statement of the law, and a judge has discretion as to the timing of instructions.  See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979) (no limitation on timing of instructions).

The judge did not impermissibly assist the prosecutor.  The defendant challenges a number of rulings and comments made by the judge, none of which falls outside a judge's permissible

---

[18] The defendant argues that the judge demonstrated partiality by asking questions of a witness.  One such example is the judge's questioning of one of the partygoers during direct examination to identify on the diagram of the house locations where the shooting occurred, the "front door," the "back door," the table where the witness was seated, and the locations that the witness described as "lit well" and "not lit very well and dark."

discretion to control court proceedings. A judge must be "the directing and controlling mind at the trial, and not a mere functionary to preserve order and lend ceremonial dignity to the proceedings." Wilson, 381 Mass. at 118, quoting Commonwealth v. Lewis, 346 Mass. 373, 379 (1963), cert. denied, 376 U.S. 933 (1964).

Our conclusion that the judge did not exceed his authority is supported by his instructions to the jury, wherein he informed them that if he "somehow conveyed to [them] an impression of some opinion [he] may have as to the outcome of this trial, [they] should disregard it." Commonwealth v. Keniston, 423 Mass. 304, 311 (1996).

6. Firearms convictions. The defendant claims that his rights under the Second and Fourteenth Amendments to the United States Constitution were violated where he was convicted of possessing a firearm without a firearm identification card and the Commonwealth produced no evidence that he lacked a firearms license. The defendant properly concedes that we have rejected this claim in previous cases, see, e.g., Commonwealth v. Powell, 459 Mass. 572, 582 (2011), cert. denied, 132 S. Ct. 1739 (2012), because the defendant bears the burden to come forward with

evidence demonstrating that he was licensed to carry a firearm. We discern no reason to revisit this conclusion.[19]

7. Relief pursuant to G. L. c. 278, § 33E. In accordance with our review pursuant to G. L. c. 278, § 33E, we vacate the defendant's armed robbery conviction. Although we discern no other basis on which to grant the defendant relief, we have considered in our § 33E review whether the lack of congruence between the jury's verdict finding the defendant guilty of felony-murder "by means of being in joint venture with the person who performed the acts which caused the death of . . . Monteiro" and the evidence that the defendant alone shot the Monteiro was error. We conclude that it was not.

The Commonwealth proceeded at trial on the theories of deliberate premeditation and felony-murder, with the underlying felony being the armed robbery of Santos. The felony-murder theory was supported by evidence that the defendant pointed a gun at Santos, robbed Santos of his gold chain, and then shot Monteiro when he intervened. The Commonwealth alleged a joint venture with other members of the New Bedford group and requested a joint venture instruction. The judge acquiesced and instructed the jury on joint venture during the final

_____

[19] The defendant also waived the defense of license by failing to file a pretrial notice as required by Mass. R. Crim. P. 14 (b) (3), as appearing in 442 Mass. 1518 (2004). See Commonwealth v. Humphries, 465 Mass. 762, 771 (2013).

instructions as he had done in the preliminary instructions to the jury. Trial counsel did not object to the joint venture instruction when it was requested or after the conclusion of the jury instructions. The judge, with the parties' agreement, prepared a special verdict slip with the following options:

"[1.] Not Guilty

"[2.] Guilty of First-Degree Murder

"[a.] By Deliberate Premeditation

"and/or

"[b.] Felony Murder

"[i.] By means of performing the acts which caused the death of Scott Monteiro while in the commission or attempted commission of a life felony [i.e. armed robbery]

"or

"[ii.] By means of being in joint venture with the person who performed the acts which caused the death of Scott Monteiro while in the commission or attempted commission of a life felony [i.e. armed robbery].

"[3.] Guilty [of] Second-Degree Murder

"[a.] By means of performing the acts which caused the death of Scott Monteiro

"or

"[b.] By felony murder [i.e. performing the acts which caused the death of Scott Monteiro while being in unlawful possession of a firearm in violation of G. L. c. 269, (§) 10 (a)]."

The parties agreed to this verdict slip notwithstanding the lack of evidence that anyone other than the defendant shot Monteiro. The jury found the defendant guilty of felony-murder under the second option: that the defendant was in a "joint venture with the person who performed the acts which caused the death" of Monteiro.

Although the jury's verdict slip answer does not mesh precisely with the evidence that the defendant alone was the shooter, the lack of consistency does not vitiate the guilty finding. Where, as here, the verdict is based on joint venture, the question we ask is whether the defendant engaged in conduct sufficiently culpable to establish his participation in the crime as a joint venturer. Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009). As long as there is "sufficient evidence of the defendant's active participation in the crime and that he had or shared the necessary intent," it is not necessary that the jury "determine specifically whether the defendant participated as an accomplice or as a principal." Commonwealth v. Rosa, 468 Mass. 231, 246 (2014). In this case, where the underlying felony was armed robbery, the Commonwealth was also required to establish that the defendant knew that at least one of the participants possessed a weapon. Commonwealth v. Garcia, 470 Mass. 24, 31 (2014).

In any event, the evidence was more than sufficient to establish that the defendant was an "active [participant] in the crime" and "shared the necessary intent" to carry out the crime, Rosa, supra, and that he knew at least one other participant in the crime was armed, Garcia, supra.  The defendant admitted through his statements, presented during the Commonwealth's case, that he was at the party, that he knew that at least four people in his group were carrying firearms, that he understood that people in his group "probably were planning on robbing" Santos, that he saw the shooter "cock" the firearm and "pistol whip" Santos, and that he was about five or six feet from the shooter when the gun was fired.  Thus, even if the jury, or at least one juror, discredited the Commonwealth's evidence that the defendant was the shooter, the jury were warranted in finding the defendant guilty of felony-murder as a joint venturer on this alternative theory.

So ordered.